Richard LOTZ, Respondent,

v.

**MISSOURI DISTRIBUTING COMPANY,**
Appellant.

No. 24104.

Kansas City Court of Appeals.

Missouri.

Feb. 1, 1965.

Somerville & Cleaveland, Ronald L. Somerville, Chillicothe, for appellant.

Don Chapman, Jr., Chapman & Chapman, Chillicothe, for respondent.

HUNTER, Judge.

This is a suit in two counts by Richard Lotz, respondent, against Missouri Distributing Company, appellant. In Count I respondent sought $2,262.20 unpaid sales commissions ("overage") covering the period of May 2, 1958, to August 27, 1960; $80.78 for unpaid commissions for the period ending February 26, 1962, and $578.66 for overcharge of truck rental. In Count II respondent sought $900.00 unpaid wages after June 12, 1962, the date of his alleged discharge. The case was tried to the court, and judgment was for respondent for the claimed $2,262.20, the claimed $80.78, for $397.51 for truck rental, plus interest for a total of $2,995.81 on Count I; and for $900.00 on Count II. The appeal is from that judgment.

This being a jury waived case, our duty is to review it upon both the law and the evidence as in suits of an equitable nature.

The judgment is not to be set aside unless clearly erroneous, and due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses. Civil Rule 73.01(d), V.A.M.R.

Appellant contends the trial court erred in overruling its motion for a directed verdict filed at the close of the evidence. Appellant also contends the judgment was for the wrong party. Appellant did not introduce any evidence at the trial. We will take up appellant's specific reasons for its contentions after setting forth the gist of the evidence concerning them.

Richard Lotz became an employee of appellant as a salaried warehouse worker on November 26, 1951. In January, 1952, he went "on the road" as a sales trainee and in September, 1952, became a route salesman. His principal duties consisted of driving a truck loaded with appellant's merchandise consigned to him and to his account, calling on customers and selling them this merchandise from the truck. His remuneration for sales made generally consisted in the difference between the price for which he sold the merchandise and the cost of it to him. He was provided a catalogue of appellant's merchandise showing a particular retail price for a certain item, and he was authorized to sell at that price or less.

Each Saturday Lotz would go to the company's office and order whatever items he needed, usually to replace those sold. An invoice in duplicate would be prepared by employees of the company. The order shown on the invoice was filled by company employees who would get the specific items from the warehouse, check them, load them on a cart and deliver them to Lotz to load on his truck. The invoice and all copies were sent to the front office where the price of each item was computed and charged to Lotz's consigned account. Lotz received one copy of the invoice and checked the items listed on it.

Lotz worked his route from each Monday morning until Friday night, calling on an

average of 65 customers per week. When he sold an order of merchandise he would take the merchandise from the truck, deliver it to the customer and collect the sales price from the customer. A sales slip in triplicate was prepared by Lotz showing the customer's name, the date, amount of merchandise, and the price charged. At the end of each sales day Lotz prepared a daily report showing the various customer's names, amount of merchandise sold to each, the amount of the commission withheld on each sale and the total commission amount for the day. At the end of each work week Lotz prepared a similar weekly report in duplicate, showing total cash sales and commissions for the week. Lotz retained one copy of these daily and weekly reports and turned in one copy of them to the company. Also at the end of each week he turned into the company the cash from these sales less whatever commission he withheld. He was given credit by the company on his account for the cash turned in.

Periodic, but infrequent, inventories were taken by the company on Lotz's truck. The process of taking the inventories consisted of removing the merchandise from the truck, counting it, totaling up the amount and checking it against the consigned account. An "ending inventory" was the term used for the mentioned periodic inventories and it determined whether Lotz had an "overage" or "shortage" with respect to his consigned account. A "beginning inventory" was the term used to describe the amount for which he was billed when starting out after the completion of a periodic ending inventory. An "overage" was described as having more merchandise on the truck at the time of an ending inventory than was called for in the consigned account. A "shortage" was described as having less merchandise on the truck at the time of an ending inventory than was called for in the consigned account.

In addition to his consigned account Lotz also had a personal account with the company. Based on the mentioned reports, the company computed withholding and social security taxes each month and debited them to his personal account. Also debited against his personal account were such items as truck insurance and shortages. This account was paid by Lotz to the company each month.

Turning to the overage dispute, Joe Lambert, vice president of appellant until April 4, 1962, testified there were 44 sales routes with an equal number of salesmen, including Lotz. These salesmen were paid by the salesman withholding from the sales price what he earned and turning the balance of it to the company's auditing department. However, these salesmen, including Lotz, were "not necessarily" instructed to take out their full commission. It was permissible for the salesman to take less than the commission actually resulting from a particular sale. As Joe Lambert phrased it, "If they're smart salesmen they take less." * * * "In other words, (the weekly sales report) shows his commission, shows his cost, what he is supposed to turn in." * * * "However, your smart operator always left a few dollars in there as a cushion, we called it, to build up an overage * * *." Joe Lambert stated that if a salesman came up short the salesman had to make it up by paying the company that amount of money. "But if he come (sic) up short a second time then he's laid off." Lambert testified he knew Lotz on occasions during the two periods of time in question took less than his commissions. Lambert gave several examples of this, and stated Lotz had told him of several particular instances he did not draw his full commission but was leaving it as a cushion.

The company generally knew of the "overage" practice by Lotz and the other salesmen and not only did not object to it but encouraged it. Lambert was asked, "Q. Were those overages paid by the company? A. Right. Q. Was it the custom and practice of the company to pay overages? A. Yes."

Lotz's testimony was in accord with that of Joe Lambert. Lotz stated that Jim Lambert, president of appellant company, and the brother of Joe Lambert, advised him to build up an overage so that he could never be checked short; that Jim Lambert told him, "It would come in to you in a lump sum you could do something with." Lotz testified that during the two periods of time in question he did not report or put all of his commissions down on his daily reports because he was trying to build up an overage. He gave several example transactions in which he engaged during the two periods of time in question which resulted in overages. With reference to the two overages he stated, "I didn't always pull my commissions." * * * "What is short (commissions not taken) is for overage that was lying there for me at the time of this inventory." Lotz testified the two overages were caused by "Nothing more than overage on commissions that I hadn't pulled in twenty-seven months."

Looking to Lotz's past experience with overages and shortages, on May 2, 1958, an ending inventory taken by the company showed an $824.85 shortage. The company charged this to Lotz's personal account and he paid it. Again on March 31, 1961, an ending inventory showed a shortage of $425.48 which Lotz paid the company.

On August 27, 1960, an ending inventory was taken by the company on Lotz's truck and this inventory showed an overage of $2,262.20. The period of time involved in the accrual of this overage is from May 2, 1958, to August 27, 1960. The company refused Lotz's request he be paid that sum, taking the position "there was error" although some fifteen rechecks by the company failed to disclose any error. Similarly, an ending inventory taken by the company on Lotz's truck on February 26, 1962, showed an overage of $154.43, which after adjustment on Lotz's personal account, left a net overage of $80.78. The period of time involved in the accrual of this overage is from March 26, 1961, to February 26, 1962. The company also refused to pay Lotz this overage although requested to do so. It is these two overages which are the subject of the first count of Lotz's suit.

The company contends Lotz's overages could have resulted not from true overages, but from mistake such as (a) if merchandise from the company went on Lotz's truck for which no invoice was made out; (b) if merchandise went on the truck and Lotz got both copies of the invoice, (c) if merchandise was invoiced to another salesman but by mistake got on Lotz's truck; (d) if another salesman returned merchandise but by company mistake Lotz was credited with the return; (e) if the company erroneously credited Lotz with another salesman's cash deposit; (f) if an item was incorrectly invoiced as to price to Lotz or if Lotz traded a customer merchandise in a manner that resulted in Lotz's retaining more merchandise than he disposed of. However, there is no evidence that any of these "could have" transactions ever occurred to Lotz. On the contrary, Lotz denied that they occurred to him or to his account. It is noteworthy that the converse of most of the "could have" transactions would result in shortages, as, for example, if Lotz returned merchandise but the company mistakenly credited another salesman's account with the returned merchandise.

■ We are of the view that under the evidence the probability and the reasonable inference is that the two overages resulted from the deliberate efforts of Lotz to build overages during the periods of time in question, as he and Joe Lambert testified.

■ While Lotz did not particularize the various transactions that resulted in the overages, he testified he intentionally engaged in numerous transactions resulting in overages over the mentioned periods of time and there is no other evidence to explain how the two overages (the amount of which is conceded) resulted. This evi-

dence, corroborated at least to some extent by that of Joe Lambert, together with the other evidence concerning the overage question is sufficient substantial evidence to support that portion of the judgment, and is not merely speculation, conjecture or surmise, as appellant contends. It is the rule that in passing on the sufficiency of the evidence to make a case for plaintiff, the plaintiff's evidence is taken as true, together with all reasonable inferences that can be drawn therefrom and any evidence offered by the defendant that supports plaintiff's case. Young v. Wheelock, 333 Mo. 992, 64 S.W.2d 950. In accordance with the rule, we conclude the trial court did not err in overruling appellant company's motion for a directed verdict at the close of all the evidence.

■ Appellant had no written rules or written contract applicable to its salesman. As mentioned, it held its salesmen, including Lotz, responsible for all shortages. Its custom was to pay them for overages. As Jim Lambert told Lotz, "It would come in to you in a lump sum you could do something with." The evidence supports a finding and we do find that the payment of overages to the salesmen was the understanding under which both Lotz and the company operated and as such was a part of the contract of employment between Lotz and the company. It was the duty of the company to credit Lotz with the two overages and to pay him for them if they were not offset by debits on his account. Our conclusion is that the trial court's finding and judgment on that portion of Count I of the petition in favor of Lotz for the overages is correct and is in accordance with the credible evidence.

Turning to the other item of Count I, the alleged $578.66 for overcharge for truck rental, the evidence discloses that in September, 1952, the company provided a 1951 Chevrolet truck to Lotz. According to Lotz, " * * * at that time (September, 1952) I leased a truck as I recall." * * * "I didn't buy the truck until '54." * * *

"I paid on a lease basis of $25.00 a week." The actual transaction was that the company bought and paid for the 1951 truck, kept title to it, and charged Lotz's personal account with the purchase price plus interest thereon. At the end of eleven months Lotz had paid all owed on his truck account, and he continued to use and drive the truck until about March, 1961. At that time, with Lotz's permission, the company disposed of the old truck, credited his personal account with the $200.00 it received on selling it, and purchased and paid $2,970.00, plus sales tax on a new truck. The company took title to this new truck, retained the title certificate, and never assigned title to it to Lotz. It charged Lotz's personal account with the $2,970.00 purchase price and sales tax, plus 7% interest thereon. Thereafter, Lotz regularly made payments in varying sums on the truck account until February 24, 1962, when he was in the process of being hospitalized. The truck was then about 10 months old and had 10,000 miles on it. At that time Lotz's truck account showed $2,065.95 unpaid on the $2,970.00 purchase price. This, according to the company's figures ($2,970 − 2,065.95 = 909.05) (sic) meant Lotz had paid $909.05 of the truck purchase price. To this figure was added $148.46 interest Lotz had been charged in 1962 ($909.05 + 148.46 = 1,057.51). On June 12, 1962, when Lotz endeavored to return to work from his hospitalization, Jim Lambert refused to permit him to work and undertook to discuss the truck account with him. Lambert prepared a memorandum (Respondent's Exhibit 17) showing the above truck account figures and also showing: "Truck Rental March 1961 to February 1962 − 11 months @ $60.00 — $660.00." On the memorandum Lambert subtracted the $660.00 as "truck rental" owed the company by Lotz from the mentioned $1,057.51 Lotz had paid in on the truck account leaving a balance of $397.51 in Lotz's favor ($1,057.51 − 660.00 = 397.51). Lambert offered to pay Lotz the mentioned $397.51 to settle the truck account.

■ It is the company's position that the truck arrangement with Lotz was that the company merely purchased the truck for Lotz and that there was no leasing involved.[1] However, the company took title to the truck from the seller and Lotz was never offered and never received title to any truck at any time. For a sale of the truck to Lotz to have taken place as appellant now contends, Lotz would have had to receive the title to it from the dealer or have had the certificate of title to it properly assigned to him by appellant. Section 301.210 RSMo 1959, V.A.M.S.;[2] Still v. Travelers Indem. Co., Mo.Sup., 374 S.W.2d 95; Sabella v. American Indem. Co., Mo.Sup., 372 S.W.2d 36. As stated in Allstate Ins. Co. v. Hartford Accident & Indem. Co., Mo. App., 311 S.W.2d 41, loc. cit. 47, concerning the delivery of a motor vehicle without delivery of the certificate of title: "If we regard it as an executory contract to complete a sale in the future (as we think we must so view it, because we will not presume that the parties intended to do an illegal and unlawful act), then the user of the car pending completion was by consent and permission of the seller * * *." Following the same reasoning, we find that appellant and Lotz entered into an oral executory contract to complete a sale in the future; that because Lotz's employment ceased the executory contract was terminated by mutual consent of the parties and by such mutual consent was treated as a lease of the truck by the company to Lotz. The company, through its president Jim Lambert, determined that a fair monthly lease rate was $60.00 per month for the eleven months, and based on that determination found it owed Lotz a balance of $397.51. Under such circumstances, and absent any complaint from Lotz, we are reluctant to disturb that determination and we accept it as supported by the evidence.

Appellant's final contention is that there is no competent substantial evidence to support the trial court's finding that Lotz was "discharged" by appellant on June 12, 1962, and that Lotz was thereby entitled to 60 days' wages totaling $900.00 by virtue of Section 290.110, RSMo 1959, V.A.M.S., and that the trial court found for the wrong party on this issue. Our examination of the evidence leads us to the conclusion that there is competent and substantial evidence to the effect that Lotz was discharged by appellant company on June 12, 1962, as he contends and as the trial court found.

However, there remains the question of the applicability of Section 290.110 RSMo 1959, V.A.M.S. to Lotz's claim for his "overages" or commissions. The trial court granted Lotz the $900.00 on the basis his income tax returns for the years he worked for appellant divided by the number of months he worked showed his average monthly compensation was over $450.00 and that under the provisions of Section 290.-110, as a discharged employee whose written request of July 31, 1962, for wages owed had been denied, he was entitled to that sum.

Section 290.110, as it existed in 1962, provided in part that "Whenever any corporation * * * shall discharge, with or without cause, or refuse to further employ any servant or employee thereof, the unpaid wages * * * then earned at the contract rate (within 7 days of a written request therefor) * * * as a penalty for such nonpayment the wages * * * shall continue from the date of the dis-

---

1. Joe Lambert, former vice president of appellant company, testified the company held title to all trucks delivered to and used by route salesmen, and that Lotz had never held title to any of the trucks he used.

2. "It shall be unlawful for any person to buy or sell in this state any motor vehicle or trailer registered under the laws of this state, unless at the time of the delivery thereof, there shall pass between the parties such certificate of ownership with an assignment thereof, as herein provided, and the sale of any motor vehicle or trailer registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void."

charge or refusal to further employ, at the same rate until paid \* \* \* (but not to exceed 60 days unless an action therefor shall be commenced within that time)."

 The word "wages" has upon occasion been *broadly* defined as compensation for services rendered by an employee to his employer including commissions earned in selling the employer's goods. See, 44A. Words and Phrases, Wages, pages 67–71; Webster's Third International Dictionary (Unabridged), page 2568; State v. Weatherby, Mo.Sup., 168 S.W.2d 1048, 1049.[3] However, the statute we are construing is punitive in nature and must be strictly construed. It refers to wages "earned at the contract rate". Here there is no *rate* for commissions set by contract. On the contrary Lotz's commissions varied considerably *and at his will.* In the ordinary transaction he sold for any sum he could obtain up to the catalogue price. In some instances when he was not able to sell at the catalogue price because of unusual competition, the company at its option gave Lotz a quantity "discount" so as to help offset the reduced price. On occasion Lotz would take back merchandise from a customer if the customer had difficulty "moving" (selling) it and Lotz would "give him something else, take it out and resell it." In some instances he traded appellant's goods for other goods not belonging to appellant. His remuneration consisted of his net gain between the cost to him of appellant's items and the price he obtained for the traded for items which had no catalogue price and which he sold for any price he could get. These variable transactions resulted in commissions or overages that were not wages or compensation "earned at the contract rate". We hold that Lotz's claim for commissions or "overages" is not within the purview or intendment of Section 290.-110, that he is not entitled to any recovery under Count II, and that the trial court

erred in granting him $900.00 thereunder. Having so ruled it is unnecessary to determine if $450.00 per month is the "same rate" at which he was being paid when discharged, or whether the written demand on July 31, 1962, for unpaid wages was timely.

Accordingly, we approve that part of the judgment which concerns Count I, and we hold that the judgment entered on Count II is erroneous and should have been for appellant. In order that the trial court may enter a new judgment in accordance with this opinion, we reverse the judgment and remand the cause.

All concur.

BROADDUS, J., not participating.

---

3. In 1963 our legislature amended Section 290.110 by adding a new sentence making it inapplicable "in the case of an employee whose remuneration for work is based primarily on commissions \* \* \*."