**John W. GREER and Shirley Mae Greer, Appellants,**

**v.**

**ZURICH INSURANCE COMPANY, a Corporation, Respondent,**

**and**

**Western Casualty & Surety Company, a Corporation, and the Fidelity & Casualty Company of New York, a Corporation, Appellants,**

**and**

**MFA Mutual Insurance Company, a Corporation, Respondent.**

**No. 53278.**

Supreme Court of Missouri, Division No. 1.

May 12, 1969.

Richard C. Collins, Bolivar, Daniel, Clampett, Ellis, Rittershouse & Dalton, B. H. Clampett, Springfield, for John W. Greer and Shirley Mae Greer.

Miller, Fairman, Sanford, Carr & Lowther, Mayte Boylan Hardie, William P. Sanford, Springfield, for Zurich Ins. Co., a Corporation.

Woolsey, Fisher, Clark, Whiteaker & Fields, Russell G. Clark, Springfield, for Western Cas. & Sur. Co.

Stewart, Reid & Turner, Kenneth H. Reid, Springfield, for The Fidelity & Cas. Co. of New York.

Almon H. Maus, Monett, for MFA Mut. Ins. Co.

STORCKMAN, Judge.

This is a suit in three counts brought pursuant to §§ 379.195 and 379.200 RSMo 1959, V.A.M.S., to reach and apply the proceeds of insurance policies to the satisfaction of a judgment obtained by the plaintiffs John W. Greer and Shirley Mae Greer, his wife, against Bobby Joe McMasters for damages for personal injuries arising out of a collision of motor vehicles. The first count sought a judgment against the defendants Zurich Insurance Company, Western Casualty & Surety Company, and The Fidelity & Casualty Company. In counts 2 and 3, the plaintiffs, in the alternative, sought to establish their respective claims against MFA Mutual Insurance Company under the unin-

sured motorist coverage of a policy of automobile insurance issued to Mrs. Greer as owner of the automobile in which plaintiffs were riding at the time of the accident. It appears that MFA was also permitted to intervene as a party in the first count by reason of its contingent interest in the outcome of plaintiffs' claim against the other three insurance companies. For convenient reference, the defendant insurance companies will sometimes be referred to as Zurich, Western, F & C, and MFA.

Trial of all three counts was before the court without a jury. The trial judge made findings of fact and conclusions of law and rendered judgment in favor of the plaintiffs and against Western and F & C, and in favor of Zurich and against the plaintiffs on count 1 of the petition. The judgment was in favor of MFA and against the plaintiffs on counts 2 and 3. The plaintiffs have appealed from the judgment in favor of Zurich on count 1 and the judgment for MFA on counts 2 and 3. Western and F & C have appealed from the judgment against them and in favor of Zurich and the plaintiffs on count 1.

The automobile collision in which the plaintiffs were injured occurred December 25, 1962. Thereafter, the plaintiffs filed suit against Bobby Joe McMasters, the driver of the other automobile, and on November 9, 1965, obtained a $15,000 judgment which was not satisfied within thirty days as provided by § 379.200. The instant action was filed May 13, 1966. The amount involved including accrued interest on plaintiffs' judgment exceeds $15,000.

At the time of the collision, Bobby Joe McMasters, a minor, was driving a 1960 Buick LeSabre automobile. The plaintiffs contend that Bobby Joe was a permissive user of the Buick automobile and an omnibus insured under liability insurance policies issued by Western, F & C, and Zurich. The Western policy was issued to Carl Cantwell, d/b/a Carl's Used Cars of Springfield, Missouri; the F & C policy

was issued to Elliott B. Young Enterprises, Inc., also a used car dealer of Springfield, the Zurich policy was issued to Commercial Credit Company, a finance corporation with offices in Springfield. Many of the facts on which the issues must be determined were stipulated. They are concerned primarily with the legal title to the Buick automobile and the right to possess and use it.

On July 25, 1962, Robert L. Oney and Betty Oney of Independence, Missouri, duly assigned the Missouri Certificate of Title for the 1960 Buick and delivered it and possession of the automobile to Van Auto Sales of Kansas City; on August 1, 1962, Van Auto Sales gave possession of the Buick to Carl Cantwell, d/b/a Carl's Used Cars, and on the same day executed the Reassignment by Registered Dealer Only on the back of the certificate of title and delivered the title so assigned to Cantwell so that "ownership of and the legal title and certificate of title to said 1960 Buick automobile thereby was delivered and transferred to said Carl Cantwell d/b/a Carl's Used Cars". Cantwell placed the Buick on his used car lot and on August 5, 1962, he agreed to sell it to Raymond Edwards of Crocker. Cantwell called Commercial Credit and made arrangements for a loan to Edwards of part of the purchase price. Edwards executed a Purchase Money Chattel Mortgage to Cantwell and also signed a Customers Statement. These instruments were assigned and delivered by Cantwell to Commercial Credit. The court found that Cantwell did not deliver the certificate of title to Edwards at any time.

Edwards made one monthly payment to Commercial Credit Corporation but refused to pay anything further. Representatives of Commercial Credit picked up and assumed control of the Buick automobile from Edwards on or about November 14, 1962. The trial court found that this was a repossession within the meaning of the Commercial Credit Corporation's policy of insurance with Zurich. Commercial Credit

discovered that Cantwell had misrepresented the terms of his transaction with Edwards, thereby rendering himself personally liable. Commercial Credit gave Cantwell an opportunity to pay the balance of Edwards' obligation which he declined to do. Cantwell knew that Commercial Credit had assumed control of the Buick and was offering the Buick for resale. Cantwell was also given an opportunity to bid on the Buick but he declined to do so.

During the interval between November 14, 1962, and December 13, 1962 Commercial Credit had possession of the Buick at its place of business in Springfield and during this period of time it sought to obtain bids on the Buick from automobile dealers. The highest bid was submitted by the F & C's named insured, Elliott B. Young, d/b/a Elliott B. Young Enterprises. Commercial Credit gave Young possession of the Buick on or about December 13, 1962. Commercial Credit did not then have a certificate of title to the Buick and did not deliver a certificate of title to Young. The trial court found that Commercial Credit Corporation agreed to obtain a certificate of title to the Buick and assign and deliver it to Young, but it did not do so prior to the accident on December 25, 1962.

After obtaining possession of the Buick from Commercial Credit, Young processed it and placed it on his used car lot as part of his inventory in the operation of his used car business. Thereafter, Young negotiated with Bobby Joe McMasters, a minor, and his parents, C. W. McMasters and Gail McMasters, concerning the purchase of the Buick automobile. The parties agreed on a purchase price which was to be paid by the trade-in of a 1958 Ford automobile and the balance by the proceeds of a secured loan. Title to the Buick was to be placed in the names of C. W. McMasters and Gail McMasters.

On December 17, 1962, C. W. McMasters and Gail McMasters obtained a loan from Securities Investment Company and executed a chattel mortgage on the Buick to secure their promissory note. The Ford was delivered to Young and the proceeds of the loan were distributed as agreed. On the same day Young gave possession of the Buick to the McMasters family. Young did not have a certificate of title for the Buick, and there was none delivered to the McMasters family by Young at the time of the transfer of possession of the Buick. The license plate which had been on the Ford automobile owned by the McMasters was removed from the Ford and placed on the Buick. From then until after the accident on December 25, 1962, the Buick was operated with the Ford license plate.

Between December 17 and 25, 1962, the Buick was used solely by Bobby Joe McMasters. On December 25, 1962, while driving the Buick in Dade County, he collided with a 1962 Corvair automobile occupied by the Greers. The trial court found that at the time of the accident the Buick was being used in connection with a resale by Commercial Credit Corporation following its repossession of the Buick, and that the Buick was being used by Bobby Joe McMasters with the permission of Commercial Credit Corporation, with the permission of Carl Cantwell, and with the permission of Elliott B. Young.

The trial court further found that Carl Cantwell had possession of the certificate of title for the Buick from August 1, 1962, until December 27, 1962 when he delivered it to Elliott B. Young. On the same date, Young paid Commercial Credit Corporation the purchase price of the Buick as agreed on about December 13. On December 27 or 28, 1962, Young delivered to the McMasters the Buick certificate of title which he had received from Cantwell two days after the accident. Thereafter, and before the end of the year, Cantwell paid to Commercial Credit the amount of the deficiency existing on the Edwards loan after the amount paid by Young for the Buick had been credited.

After the accident the Buick was repaired out of the proceeds of collision insurance carried by the McMasters on their Ford automobile; however, the McMasters refused to make any payments on the promissory note given by them to Securities Investment Company. In partial settlement of a suit filed by Securities Investment against C. W. and Gail McMasters the McMasters gave Securities Investment possession of the repaired Buick and the original Missouri Certificate of Title they had received from Young after he got it from Cantwell. The Buick and the certificate of title were then delivered by Securities Investment to another used car dealer in Springfield who in turn delivered the automobile to a dealer in Arkansas together with the original certificate of title which was then forwarded to the Motor Vehicle Division of the Arkansas Department of Revenue where it still reposed at last account on December 12, 1966. The policies of Western, F & C, and Zurich were in full force and effect at the time of the accident. More of the policy provisions and pertinent facts will be discussed in connection with the various contentions made.

The method of reviewing cases tried without a jury is provided in S.Ct. Rule 73.01(d), V.A.M.R., which in pertinent part is as follows: "The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The appellate court shall consider any evidence which was rejected by the trial court and duly preserved for the appeal when the appellate court believes such evidence to be admissible."

■ Both Fidelity & Casualty and Western contend that their policies did not apply to the automobile in question. Fidelity & Casualty Company urges that it could only be liable under "Automobile Hazards", paragraph 1(a) of Mr. Young's policy, which is entitled "All Automobiles" and specifies for coverage: "The ownership, maintenance or use of any automobile for the purpose of garage operations, and the occasional use for other business purposes and the use for non-business purposes of any automobile owned by or in charge of the named insured and used principally in garage operations". It asserts it is not liable under this provision because the Buick automobile at the time of the accident was not being used "for the purpose of garage operations" and was not "in charge of the named insured and used principally in garage operations". This contention overlooks the policy definitions of "garage" operations and the extended coverage granted thereunder.

The word "garage" as used in Part I of the policy is defined, inter alia, to mean "an automobile sales agency". Inserting this definition in lieu of "garage" in the first clause of 1(a) and noting that the functions specified are in the disjunctive, coverage is provided for the "use of any automobile for the purpose of [automobile sales agency] operations, * * *." In the paragraph entitled "2. Automobiles not Owned or Hired", similar language is employed: "The use in connection with garage [i. e., automobile sales agency] operations of any automobile which is neither owned nor hired by the named insured, * * *." If these clauses are intended to cover any automobile being used in connection with the automobile sales agency, then the phrases "in charge of the named insured and used principally in garage operations" relating to "non-business purposes" would be of no consequence since they are not exclusionary in nature.

Western also makes the contention that the automobile operated by McMasters was not covered under its policy of insurance because it was being used at the time for nonbusiness purposes and not principally in the business of the named insured Carl Cantwell. Western's definition of hazards so far as pertinent is: "The ownership, maintenance or use of the premises for

the purpose of an automobile sales agency, * * * and all operations necessary or incidental thereto; and the ownership, maintenance or use of any automobile in connection with the above defined operations, and the occasional use for other business purposes and the use for non-business purposes of (1) any automobile owned by or in charge of the named insured and used principally in the above defined operations, * * *." It, therefore, appears that Western's policy covers the "use of any automobile in connection with" an automobile sales agency and its legal effect in this regard is the same as that of F & C.

Western and F & C rely chiefly on Kahn v. Lockhart, Mo.App., 392 S.W.2d 30, which is considerably dissimilar on the facts and the insuring clause applied. Lockhart paid his employer Rudy Fick, Inc., $150 for a used Ford automobile, took possession and received from Rudy Fick, Inc., a certificate of title which was signed by the transferror but not acknowledged and the name of the transferee was not filled in. Lockhart had the assignment acknowledged, but never inserted his name as assignee. He kept the Ford at his home for about six months and did not use it until the Mercury car he ordinarily used was wrecked. Kahn obtained a judgment against Lockhart for personal injuries growing out of this accident and sought to collect it from the insurers of Lockhart and Rudy Fick, Inc. The court of appeals affirmed the judgment against the insurer of Lockhart's Mercury, but ruled that the insurer of Rudy Fick, Inc., was not liable. The court held that title had not passed to Lockhart because of his failure to complete the certificate and register the Ford in his name; that he was an insured as an employee of Rudy Fick, Inc., but that the plaintiff failed to prove that the Ford was an automobile used principally in insured's business at the time of the accident. Mistele v. Ogle, Mo., 293 S.W.2d 330, and Hartford Accident & Indemnity Co. v. Casualty Underwriters, D.C., 130 F.Supp. 56, are also cited. They like the Kahn case failed to meet the issue here involved.

The applicable insuring clauses in Allstate Insurance Co. v. Hartford Accident & Indemnity Co., Mo.App., 311 S.W.2d 41, were practically the same as those in the Western and F & C policies. At page 44, the opinion by Judge Ruark states the coverage as follows: "Under the Definition of Hazards the policy covered 'the ownership, maintenace or use of the premises for the purpose of an automobile dealer * * * and all operations necessary or incidental thereto; and the ownership, maintenance or use of any automobile in connection with the above defined operations.'" In Allstate, as here, possession of the automobile was delivered to the prospective purchaser without passing the certificate of title properly assigned. For failure of the parties to comply with the mandatory requirements of § 301.210, RSMo 1959, V.A.M.S., the Allstate opinion held the attempted sale was void and in construing the policy coverage stated: "The business of the insured was that of 'Pontiac Sales.' The hazard defined was 'the ownership, maintenance or use of the premises for the purpose of an automobile dealer * * * and the ownership, maintenance or use of any automobile in connection with the above defined operations * * *.' It is common knowledge that it is the practice of dealers to permit the driving of an automobile by prospective purchasers, especially by those customers whose purchase is in the making, and that such dealers, as a part of their service to their customers, permit the use of their dealer's plates and the use of the automobile after the sale has been agreed upon but before the formalities of title transfer have been processed and completed. 'There is no reason to doubt that the parties contemplated that under such circumstances the policy would protect not only [the seller] as the named assured, but also [the buyer] who was operating the automobile with the consent of the named assured.'" 311 S.W.2d 41, at pp. 46–47.

Likewise in Haynes v. Linder, Mo.App., 323 S.W.2d 505, the purported sale was held void for failure to pass the title documents with possession of the automobile, but the court held coverage of the seller's liability policy was extended to the automobile in the hands of the prospective purchaser. In Sabella v. American Indemnity Company, Mo., 372 S.W.2d 36, at p. 40, this court en banc stated that the rule established in Allstate and followed in Haynes was correct and in accord with principles announced by this court and further held: "The requirements of § 301.210 are definite and positive; and strict compliance is required by our decisions (hereinabove cited) to pass title to any motor vehicle. Therefore, we hold that until the certificate of title properly assigned is delivered by the seller to the buyer the buyer does not become the owner. We further hold that, when the seller delivers a motor vehicle to the buyer without delivering to him the certificate of title, he is permitting the buyer to use the vehicle so as to make him an additional insured, under the policy provision herein involved, until title passes to him."

■ The fact that the Buick automobile was being operated by McMasters for his personal and private purposes did not preclude such use being at the same time in furtherance of the business purposes and objectives of the defendants' automobile sales agencies and within the coverage of the F & C and Western liability policies. The nonbusiness insuring clauses are not controlling in this situation. Allstate Insurance Co. v. Hartford Accident & Indemnity Co., Mo.App., 311 S.W.2d 41, 46–47 [4–6]; Haynes v. Linder, Mo.App., 323 S.W.2d 505, 512 [14]; Sabella v. American Indemnity Co., Mo., 372 S.W.2d 36, 40 [1, 2]. The contention of Western and F & C that the coverage of their policies did not extend to the Buick automobile is denied.

The Fidelity & Casualty Company does not challenge the finding and holding that McMasters was driving the Buick with the permission of Elliott Young, its named insured, and states that it is raising no question in that regard. Neither does Zurich assign error with respect to the issue of permission although it makes reference to the subject in its written argument. On the other hand, Western contends that McMasters was not an insured under its policy because he was operating the Buick automobile without the permission of Carl Cantwell, its named insured.

The general rule in the circumstances of this case is well stated in Couch on Insurance 2d, Vol. 12, § 45:386:

"For the purpose of the application of an omnibus clause there is authority that a sale has no legal significance where the title has not been technically transferred, although in all other respects the sale is complete. In such circumstances the seller remains the owner and therefore has the power to give permission to the buyer to use the car, and such permission brings the latter within the scope of an omnibus clause." This is in accord with the Missouri rule. See Sabella v. American Indemnity Co., Mo., 372 S.W.2d 36, 40 [2]; Haynes v. Linder, Mo.App., 323 S.W.2d 505, 509 [2–5]; Allstate Insurance Co. v. Hartford Accident & Indemnity Co., Mo.App., 311 S.W.2d 41, 46–47 [6].

■ Each of the defendants' policies contained an omnibus clause which provided in legal effect that the word "insured" included any person while using, with the permission of the named insured, an automobile covered by the policy. The permission contemplated by an omnibus clause can be either express or implied from the conduct of those in a position to grant it. Hanover Insurance Company v. Abchal, Mo.App., 375 S.W.2d 605, 608 [1,3]; Haynes v. Linder, Mo.App., 323 S.W.2d 505, 510 [8]; Varble v. Stanley, Mo.App., 306 S.W.2d 662, 666 [4]. See also § 303.190, subsection 2(2), RSMo 1959. 45 C.J.S. Insurance § 829c(2) (b) aa, cited in Haynes v. Linder at p. 510, makes this further re-

finement at p. 897: "The permission contemplated is something more than mere sufferance or tolerance without taking steps to prevent, and the term is used, rather, in the sense of leave, license, or authority. The term necessarily implies power to prevent."

The possession of the Buick automobile went from Carl Cantwell to Edwards to Commercial Credit Corporation to Elliott Young and then to McMasters. The certificate of title assigned to Carl's Used Cars remained in Cantwell's possession at all times until two days after the accident. Mr. Cantwell knew that the first prospective buyer, Edwards, had defaulted and that Commercial Credit had taken possession of the Buick. Cantwell was invited but declined to pay Commercial Credit the balance due on the Edwards obligation for which he was liable by reason of misrepresenting the true character of the Edwards transaction. Mr. Cantwell also declined to buy the automobile from Commercial Credit when it was offered to him and he knew that the finance company was offering it for sale to others and that Mr. Young bought it for resale on the condition that legal title be furnished. When Mr. Cantwell found the certificate after the accident, he delivered it to Mr. Young, who passed it on to McMasters.

■ Haynes v. Linder, supra, was also a case where possession of the automobile passed through several hands without the certificate of title being delivered. So was Brewer v. DeCant, 167 Ohio St. 411, 149 N.E.2d 166. Cantwell held the title documents and had the right to possession of the automobile subject to the claims of others created by his own wrongful acts. By producing the title documents and paying his obligations, Cantwell could have retaken possession of the Buick automobile. He, as well as Commercial Credit and Young, had the *power to prevent* possession of the automobile being given to McMasters with permission to use it. Pearl v. Interstate Securities Co., 357 Mo. 160, 206 S.W.2d 975, 978 [8]. If permission was

not express, it may be implied from the conduct of Cantwell and the others whose unlawful conduct in furtherance of their financial interests contributed to the delivery of possession of the automobile to McMasters without a properly assigned certificate of title. We hold that McMasters was operating the automobile with the permission of the named insureds of the defendants in question and hence he was an insured under their policies. Haynes v. Linder, Mo.App., 323 S.W.2d 505, 509–510 [2–6]; Sabella v. American Indemnity Co., Mo., 372 S.W.2d 36, 40 [2]; Brewer v. DeCant, 167 Ohio St. 411, 149 N.E.2d 166, 168 [1]; Liberty Mutual Insurance Co. v. Ohio Casualty Insurance Co., 6 Cir., 404 F.2d 33; United States Fidelity and Guaranty Co. v. Trussell, D.C., 208 F.Supp. 154, 162 [8].

Following the omnibus coverage provisions, the F & C policy states:

"None of the following is an insured:

"(i) *   *   *   *   *   *

"(ii) *   *   *   *   *   *

"(iii) any person or organization other than the named insured with respect to any automobile   *   *   *   (b) possession of which has been transferred to another by the named insured pursuant to an agreement of sale".

This is a part of the standard provisions of F & C's garage liability policy which was issued after July 1962. It does not appear in the Western and Zurich policies which were issued prior to that time. The Fidelity & Casualty Company contends that the transaction between Mr. Young and the McMasters was a transfer of possession of the automobile "pursuant to an agreement of sale" as that term is used in its policy and, therefore, McMasters was not an insured under its policy.

When Elliott Young's bid for the Buick was accepted, he gave Commercial Credit a check which was required a properly assigned certificate of title to be attached before it could be paid. He took possession of

the Buick but no title was passed until after the accident. On December 17, 1962, Young and the McMasters signed a document entitled "Used Car Order" dated December 17, 1962, which described the Buick and a 58 Ford to be traded in, showed the total purchase price, the used-car allowance, and the balance due. Young was referred to as Dealer and McMasters as Purchaser and Buyer. An X was placed in the square opposite "Sold As Is". F & C stresses the fact that the Order is referred in one place as a "purchase contract". By the terms of the Order the buyer agreed "to accept delivery" on December 17, 1962. On the same date the McMasters executed a promissory note payable to Securities Investment Company secured by a chattel mortgage on the Buick and the proceeds of the loan were distributed in accordance with the terms of the used-car order.

Mr. Young delivered possession to McMasters on December 17 but did not pass a certificate of title. The Order said nothing about when the certificate of title would be delivered and no space was provided on the form for the insertion of that information; however, the evidence tended to show, and the trial court found, that Young promised to supply the title documents later. The trial court found in accordance with the evidence that title to the Buick was then in the possession of Cantwell and so remained until after the accident. So far as the record shows, all phases of the transaction were completed on December 17, 1962, except the delivery of the title documents of the Buick and of the Ford being traded in, the latter being on deposit with a finance company. In this state of the record, the trial court found that possession of the Buick was transferred pursuant to a void sale and not pursuant to an agreement of sale. Counsel have not furnished us with any appellate court case directly deciding the issue F & C presents and we have found none.

In a broad sense, every automobile sold is delivered "pursuant to an agreement of sale"; without agreement there could be no sale. The narrower question here is whether an agreement which postpones passing of title beyond the delivery of possession of the motor vehicle is recognizable under Missouri law as a valid and binding sales agreement. Subsection 4 of § 301.210 provides: "It shall be unlawful for any person to buy or sell in this state any motor vehicle * * * registered under the laws of this state, unless at the time of the delivery thereof, there shall pass between the parties such certificate of ownership with an assignment thereof, * * *, and the sale of any motor vehicle * * * registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void." The language is plain and the Missouri decisions have uniformly held that a sale contrary to the statutory provisions is fraudulent and void.

The Fidelity & Casualty Company asserts that its policy term "pursuant to a sales agreement" is equivalent to the phrase "executory contract to complete a sale in the future" used in Missouri decisions such as Allstate Insurance Co. v. Hartford Accident & Indemnity Co., Mo.App., 311 S.W.2d 41, 47 [10]; Haynes v. Linder, Mo.App., 323 S.W.2d 505, 511; Sabella v. American Indemnity Co., Mo., 372 S.W.2d 36, 40, Moore v. State Farm Mutual Automobile Insurance Co., Mo.App., 381 S.W.2d 161, 166, and Lotz v. Missouri Distributing Company, Mo.App., 387 S.W.2d 179, 184 [5]. Nevertheless, these and other cases recognize that by virtue of §§ 301.210 and 301.440 a contract for the sale of a motor vehicle registered under Missouri law without assignment and delivery of the certificate of title is unlawful and may be repudiated while the transaction remains executory in that the title documents have not been delivered. Hymer v. Dude Hinton Pontiac, Inc., Mo.App., 332 S.W.2d 467, 469 [2]; Matthews v. Truxan Parts, Inc., Mo.App., 327 S.W.2d 28, 36 [5, 6]; Haynes v. Linder, Mo.App., 323 S.W.2d 505, 511 [10]; Allstate In-

surance Co. v. Hartford Accident & Indemnity Co., Mo.App., 311 S.W.2d 41, 46 [2, 3]; Riss & Co. v. Wallace, 350 Mo. 1208, 171 S.W.2d 641, 643–644 [4, 5], 151 A.L.R. 512. In Riss & Co. v. Wallace the defendant alleged that he had bought motor trucks from the plaintiff and had fully paid the purchase price but had received no certificates of title. This court characterized the transaction in this fashion: "that kind of a *contract* of purchase is insufficient to pass either the title or right to possession of motor vehicles, for the statute says that a sale 'without the assignment of such certificate of ownership, shall be fraudulent and void.'" Emphasis supplied. 171 S.W.2d at pp. 643–644. In Matthews v. Truxan Parts, Inc., the court observed that: "Strictly speaking, an action by the buyer of a motor vehicle to recover what he has paid under a *void* contract of sale does not involve rescission or the rules relating thereto, for rescission contemplates a *voidable but existing* contract." 327 S.W.2d at p. 37. In Schroeder v. Zykan, Mo.App., 255 S.W.2d 105, the buyer of a motor truck specially equipped for cleaning septic tanks was permitted to repudiate the transaction and recover what he had paid because the seller did not pass a properly assigned certificate of title when possession of the truck was delivered. In permitting the recovery the court stated: "the illegality of the contract to which he was a party does not prevent plaintiff from suing for the relief demanded, because the contract, although declared by statute to be fraudulent and void, was *malum prohibitum,* and not *malum in se,* since it does not involve any act of moral turpitude. 17 C.J.S. Contracts, § 278c, p. 667. It falls within the class of those contracts which permit of repudiation while yet executory." 255 S.W.2d at p. 111 [10]. See also Lotz v. Missouri Distributing Company, Mo.App., 387 S.W.2d 179, 184 [5], and Galati v. New Amsterdam Casualty Co., Mo.App., 381 S.W.2d 5, 7 [1–4]. The mere fact that such a transaction is "executory" does not render it a valid and enforceable agreement of sale.

As a general rule, a valid and enforceable contract may not arise out of a transaction prohibited by statutory law. Schoene v. Hickam, Mo., 397 S.W.2d 596, 602 [11]; Gilbert v. Edwards, Mo.App., 276 S.W.2d 611, 620 [13, 14]. The question is one of legislative intention. 17 C.J.S. Contracts § 201; 17 Am.Jur.2d, Contracts § 166. Section 301.210, RSMo 1959, V.A.M.S., is designed to hamper the traffic in stolen automobiles and to prevent fraud and deceit in the sale of used cars. It is a police regulation of the highest order and should be liberally construed to accomplish its purpose.

The sale or attempted sale of the Buick was fraudulent and void because possession of the automobile was delivered without the certificate of title being delivered at the same time. Clearly the transaction cannot be given a legal standing simply because Mr. Young promised and agreed to supply McMasters with a proper certificate of title at a later date. This is precisely the sort of transaction which the statute forbids. The clear legislative intent is to outlaw and render void the agreement to sell as well as the sale of a motor vehicle contrary to the provisions of § 301.-210.

The policy provision in question cannot be applied where possession of the motor vehicle has been transferred pursuant to a *void* agreement of sale. To do so would be contrary to the public policy of Missouri as expressed in the statutes and decisions heretofore cited. See also § 303.190 of the Motor Vehicle Safety Responsibility Law which requires a policy issued pursuant to that chapter to contain an omnibus clause. The Fidelity & Casualty Company is not exempted by the provision in question.

Zurich contests its liability on several grounds. The first contention is that the plaintiffs did not sustain their burden of proving that the Buick automobile was being maintained or used in connection with a resale following repossession, and that

the trial court, therefore, erred in finding that McMasters was covered by the policy. By an endorsement attached to the policy, Zurich agreed that the insurance for bodily injury and property damage liability which was afforded "with respect to an owned automobile applies with respect to any automobile while being repossessed by the named insured, or while being maintained or used in connection with resale following such repossession"; this extended coverage was limited by the provision that the "unqualified word 'insured' does not include any person or organization from whom the automobile has been repossessed." Zurich urges that its policy only insured motor vehicles "legally repossessed." It depends largely on cases from other states construing statutes which attach special consequences to the repossession of automobiles such as the extinguishment of all or a part of the remaining debt. Such cases are not persuasive here.

■■■ The meaning of the terms of an insurance policy is ordinarily tested by the common understanding and speech of men; and, if there is a conflict between a technical definition and the meaning which would normally be understood by the average layman, the layman's definition will be applied unless it plainly appears that the technical meaning is intended. Irelan v. Standard Mutual Association, Mo.App., 379 S.W.2d 815, 817 [1]; United Services Automobile Association v. Pinkard, D.C., 258 F.Supp. 805, 806 [3–5], affirmed 4 Cir., 356 F.2d 35. Repossession is commonly understood as the act of resuming the possession of property when the purchaser fails to keep up payments on it. Webster's Third New International Dictionary. As used in the policy, the term does not refer to any technical procedure. Furthermore, Commercial Credit's records referred to the transaction as a "repossession" and to the Buick as a "repossessed car". The Buick automobile was repossessed by Commercial Credit within the meaning of the policy although Edwards gave it up willingly without regard to any particular form or legal procedure.

■■■ Zurich further urges that Commercial Credit had no legal or equitable right to repossess the Buick from Edwards or to maintain or use it in connection with a resale because the chattel mortgage executed by Edwards and assigned to Commercial Credit was void. Zurich does not mention the promissory note which the mortgage purportedly secured. Furthermore, Carl Cantwell had become personally obligated to Commercial Credit and it took possession of the Buick with some show of authority at least as far as Edwards and Cantwell were concerned. Commercial Credit offered the automobile to Cantwell only on the condition that he pay the remainder of Edwards' obligation or "buy" the automobile. Although Commercial Credit did not have legal title, it could hold the automobile against a person who had no right if it had a special property right or interest in the automobile protectible by possession. Pearl v. Interstate Securities Co., 357 Mo. 160, 206 S.W.2d 975, 978 [6–8].

■■■ Zurich further contends that Commercial Credit took possession as the permittee and agent of Cantwell upon surrender or abandonment of the automobile by Edwards and as such permittee and agent it "was not insured by Zurich's policy." This argument is unsound because Commercial Credit was the *named insured* in the policy. Furthermore, as we have previously indicated, Commercial Credit had a financial interest in the automobile which Edwards was not attacking and which Cantwell was in no position to oppose because he, the holder of the title papers, had created the obligation by assignment of the note and chattel mortgage to Commercial Credit under circumstances which made him personally liable for payment. The claim that Commercial Credit was acting only as permittee or agent of Cantwell is without merit.

Zurich further says that if Commercial Credit did repossess the Buick it was re-

possessed from Cantwell and he, therefore, would be specifically excluded from coverage by the endorsement and that such exclusion would also extend Cantwell's permittee, McMasters. This contention is not supported by the evidence or the law. Commercial Credit repossessed the automobile from Edwards, not Cantwell, and thereafter asserted a right of possession superior to both of them for the payment of the money due it.

■ We have heretofore considered the coverage of the omnibus clause of the Zurich policy and held that McMasters was operating the Buick with the permission of Commercial Credit and was an insured under the omnibus clause of its liability policy at the time of the accident. The trial court did not err in so holding.

The trial court found that Zurich "was prejudiced by the failure of any insured or any injured party or any other defendant to give notice" of the accident or of plaintiffs' personal injury suit prior to April 25, 1966. The court's Conclusion of Law No. 3 is that Zurich was "not liable for the reason that the terms of its policy were not met and it was prejudiced thereby, but at the time of the accident, it provided coverage to Bobby Joe McMasters." The accident occurred December 25, 1962. The plaintiffs' personal injury suit was filed November 13, 1964, and the plaintiffs obtained their judgment against McMasters on November 9, 1965. None of the interested parties learned of the existence of the Zurich policy until April 21, 1966. Four days later on April 25, 1966, notice was given to Commercial Credit and Zurich that the plaintiffs claimed Zurich was liable for payment of the judgment in the personal injury case. Zurich was joined as a party in the garnishment suit about May 13, 1966. The plaintiffs' contention on appeal is that failure to give notice of the accident and suit was excusable under the circumstances and that Zurich was not prejudiced by failure to receive notice sooner. On the other hand, Zurich contends that notices of the acci-

dent and suit were conditions precedent and the failure to comply with them precludes the plaintiffs from maintaining the garnishment action against it.

The pertinent provisions are a part of the general conditions of the policy and are as follows:

"10. Notice of Accident. When an accident occurs written notice shall be given, by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses.

"11. Notice of Claim or Suit. If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

12. * * * * * *

"13. Action Against Company. No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

"Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to .the extent of the insurance afforded by this policy. * * *"

The question presented has not been passed on directly by this court. Cases from other states and federal decisions, some of them interpreting the Missouri rule, have reached various results and perhaps applied various principles. On the one extreme is Florio v. General Accident Fire &

Life Assurance Corp., 396 F.2d 510, a decision by the Second Circuit applying the New York direct action statute which is quite similar to our §§ 379.195 and 379.200. Florio was injured September 14, 1949, and filed suit in 1950 against Peter Guittard and his driver. The defendants did not notify their liability insurance carrier of the accident or the institution of suit. Florio gave no notice since he did not know if Guittard was insured although he made an effort to find out. Neither Guittard nor his driver appeared although they were served with summons and in 1957 Florio took a default judgment against them. Further efforts to learn the name of the insurance company were unsuccessful and Guittard died in 1958. In August 1964 sons of Guittard found a liability insurance policy which was in force at the time of the accident. Plaintiff's attorney promptly notified General Accident, the insurer, and served it with a copy of the 1957 default judgment based on the 1949 accident. General Accident denied liability for failure to give timely notice. In the garnishment action a jury found (1) that no notice of the accident or suit had been given the defendant General Accident, and (2) that the plaintiff Florio gave written notice of the 1949 accident to General Accident "as soon as was reasonably possible". Judgment for plaintiff against General Accident was affirmed on appeal. Section 167(1) of the New York Insurance Law, McKinney's Consol.Laws, c. 28, provides with respect to any notice required to be given by an insurance policy that "if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible", a claim made by the insured or any other claimant under the policy shall not be invalidated. The policy itself fixed no definite time but provided, as in the case at bar, that notice of the accident should be given "as soon as practicable" and that notices in connection with the suit should be forwarded to the company. There was also in the policy the provision that no action

shall lie against the company unless there has been full ·compliance with all of its terms. The Florio opinion points out that while the existence of insurance coverage and the identity of the carrier are now a matter of public record and can readily be obtained, there was no public record in 1949 of automobile liability insurance coverage and in some cases a claimant could not ascertain whether a policy existed. The opinion recognizes that under New York law a claimant authorized to bring suit against the insurer stands in the shoes of the insured and must abide by any applicable provisions of the policy. The opinion holds that under the special circumstances as aided by § 167, subd. (d) it is possible for a plaintiff to give timely notice of an accident and suit to the insurer even after judgment has been obtained against the insured so long as the judgment creditor has been reasonably diligent in attempting to learn the identity of the insurer. Apparently under N.Y. CPLR § 5015(a) (1) the court which rendered a judgment may relieve a party from it for an excusable default if motion is made within one year after service of a copy of the judgment. The defendant General Accident did not seek to have the judgment set aside. The opinion does not discuss the matter of prejudice although it does point out that the defendant contended, since it had the right under the policy to negotiate, settle or defend an action against it, the Insurance Law cannot and should not be construed to deprive it of that right. This phase of the decision apparently turned on the proposition that Florio had done all he could to give notice "as soon as was reasonably possible."

Perhaps the extreme of the cases cited by defendant Zurich is Waters v. American Automobile Insurance Co., 124 U.S. App.D.C. 197, 363 F.2d 684, decided by the Court of Appeals of the District of Columbia, which purported to apply the Missouri law as it found it in decisions of the United States Court of Appeals for the Eighth Circuit and the appellate courts of

Missouri. The policy in question had the usual provision that written notice of the accident should be given by or for the insured as soon as practicable and that compliance with all terms of the policy was a condition precedent to suit. The accident occurred on September 7, 1957, and notice was given on April 21, 1958, when counsel for the plaintiff notified the defendant insurance company that he was representing the plaintiff in her claim against the insured. The company disclaimed liability asserting among other things that it had not received timely notice of the accident. Default judgment was obtained and garnishment proceedings were instituted. Judgment for the defendant insurance company was affirmed on appeal. The opinion held that the policy provision for written notice as soon as practicable had not been complied with where the insurance company was not given notice of the automobile accident until nearly eight months after the accident happened. The opinion further holds that under the law of the District of Columbia and Missouri the insurance company could rely on the provision for written notice of the accident without establishing that it had been prejudiced by delay in receiving notice of the accident. It is not reasonably possible to discuss in this opinion all of the cases cited by the parties but reference to others will be made.

▉ Sections 379.195 and 379.200, RSMo 1959, V.A.M.S., provide certain safeguards for the insured as well as his claimant and gives the judgment creditor of the insured a right of direct action against the liability insurance carrier. Chapter 303 of our statutes is the Motor Vehicle Safety Responsibility Law. While this chapter does not apply to automobile liability policies generally, it is some indication of the public policy of the state. Other statutes and the decisions of Missouri establish that the insurance business is affected with public interest and is subject to regulation in the interest of the policy holders and the public. In general, policies should be given a reasonable construction in accordance with their terms and should be interpreted to provide coverage when reasonably possible to do so rather than to defeat it.

▉ It is generally recognized in Missouri as well as elsewhere that, after an injured person has obtained a judgment against an insured defendant, the judgment creditor stands in the shoes of the insured person and his rights are no greater and no less than the insured's rights would have been if he had paid the judgment and then sued his insurance company to recover the amount so paid. Meyers v. Smith, Mo., 375 S.W.2d 9, 15 [5]; Haines v. Harrison, 357 Mo. 956, 211 S.W.2d 489, 492 [4]; Drennen v. Wren, Mo.App., 416 S.W.2d 229, 233 [6]. It is stipulated that on October 25, 1965, the attorney for the defendant McMasters by letter notified the Springfield office of Commercial Credit that the Greer personal injury action was pending and set for November 8, 1965; the letter identified the accident and formally tendered to Commercial Credit or its insurance carrier the defense of the action. Commercial Credit acknowledged the notice but advised defendant's attorney that it was not a party in interest. It appears that Commercial Credit did not pass this information on to Zurich its insurer.

▉▉ Conditions of an automobile liability policy are valid and enforceable which require that written notice be given to the liability insurance carrier as soon as practicable when an accident occurs and that suit papers be forwarded immediately, but a substantial compliance with such provisions is sufficient and a mere failure to comply in some immaterial respect does not justify a disclaimer of liability. Winterton v. Van Zandt, Mo., 351 S.W.2d 696, 702 [4]; Quisenberry v. Kartsonis, Mo., 297 S.W.2d 450, 453 [2]. As long ago as McFarland v. United States Mutual Accident Ass'n, 124 Mo. 204, 27 S.W. 436, at p. 439, this court stated with respect to the time of performance: "The word 'immediate' cannot be construed literally with-

out, in many cases, causing a forfeiture. It is frequently impossible, under the circumstances of the accident or death, to give immediate notice. This condition subsequent must be liberally construed in favor of the beneficiary. So it has been uniformly held that this and similar words should be construed to mean 'within a reasonable time.' 2 May, Ins. § 462; [Saint Louis] Insurance Co. v. Kyle, 11 Mo. [278] 289. So, though the time in which the notice shall be given is fixed under the contract, if the circumstances of the accident are such as to make it impossible to comply with the condition, giving the notice within a reasonable time after it becomes possible has been held sufficient."

█ "Courts do not favor forfeitures particularly where they are the result of technical provisions in insurance contracts, and forfeitures are never permitted unless the right thereto is clearly established." 45 C.J.S. Insurance § 473(1), pp. 150–151. To the same effect is McFarland v. United States Mutual Accident Ass'n, 124 Mo. 204, 27 S.W. 436, 438; Galati v. New Amsterdam Casualty Co., Mo.App., 381 S.W. 2d 5, 7 [4]; French v. Franklin Life Insurance Co., 237 Mo.App. 696, 164 S.W.2d 90, 98 [2]; Daniel v. Aetna Life Insurance Co., 225 Mo.App. 357, 36 S.W.2d 688, 694 [4]. The provision the defendant Zurich relies on is that: "No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, * * *." Whether this is termed a condition precedent or subsequent, or a forfeiture is immaterial. It, in effect, provides for an avoidance or forfeiture not of the policy but of a claim under the policy because the insurance contract has proscribed recourse to the legal remedy. The condition should be construed most strongly against the insurance carrier.

The plaintiffs assert that the failure of McMasters, the omnibus insured, to comply with conditions 10 and 11 was excusable because McMasters had no direct contact with Commercial Credit, the named insured, he could not reasonably be expected to know of the Zurich policy or its terms, and he gave notice as soon as he could which was within four days after he discovered the existence of the policy. In Dixon v. United States Fidelity & Guaranty Co., Mo.App., 155 S.W.2d 313, the motor vehicle operator against whom a claim for damages was made likewise did not know of the existence of the liability insurance policy that covered him although the insurer had knowledge of the accident and counterclaim from other sources. The opinion by Judge Bennick states that "in considering the question of the timeliness of notice, regard is to be had for all the surrounding facts and circumstances in the case which may be relevant to the question of whether there was a reasonable excuse for the insured's noncompliance, or delay in compliance, with the exact condition of his policy; and if such a reasonable and valid excuse appears, then, absent a clear and unmistakable provision for forfeiture upon the insured's nonobservance of the letter of the particular requirement, the company will not be entitled to avoid liability or defeat recovery for the amount of the loss incurred by the insured within the coverage of his policy." 155 S.W.2d 313, 317 [2]. In addition to the Missouri cases cited in Dixon, the later decision of Northwestern Mut. Ins. Co. v. Independence Mut. Ins. Co., Mo.App., 319 S.W.2d 898, recognized the rule in saying at p. 904 that: 'Notice cannot be required until there is knowledge of the existence of a policy requiring the giving of notice." This view has considerable support in other jurisdictions. See Annotation: Liability insurance: clause with respect to notice of accident or claim, etc., or with respect to forwarding suit papers, 18 A.L.R.2d 443, especially § 23 at p. 478. The Dixon case correctly states the applicable rule.

█ Ordinarily, whether a delay by the insured in notifying the liability insurer of an accident and in forwarding suit papers constitutes a material breach of the policy conditions is a fact issue to be de-

termined on the particular facts of each case. Winterton v. Van Zandt, Mo., 351 S.W.2d 696, 702 [4–5]; Meyers v. Smith, Mo., 375 S.W.2d 9, 17 [13]; Cockrell v. Farmers Mutual Automobile Ins. Co., Mo. App., 427 S.W.2d 303, 308 [1]. On the evidence in this case we cannot say as a matter of law that Zurich was relieved of liability solely because of the delay in giving notice.

■■■ One of the factors to be considered by the trier of facts in determining if notice of the accident was given and the suit papers were forwarded within a reasonable time and agreeable to policy conditions is whether the insurer has been prejudiced because of the delay or lack of notice. Cockrell v. Farmers Mutual Automobile Ins. Co., Mo.App., 427 S.W.2d 303, 308 [2]; Schultz v. Queen Insurance Co., Mo.App., 399 S.W.2d 230, 234 [2]; Meyers v. Smith, Mo., 375 S.W.2d 9, 15 [8, 9]; Quisenberry v. Kartsonis, Mo., 297 S.W. 2d 450, 455 [6]; Dixon v. United States Fidelity & Guaranty Co., Mo.App., 155 S. W.2d 313, 317 [1]; St. Paul & Kansas City Short Line R. Co. v. United States Fidelity & Guaranty Co., 231 Mo.App. 613, 105 S.W.2d 14, 25 [16]; Walker, to Use of Foristel, v. American Automobile Ins. Co., 229 Mo.App. 1202, 70 S.W.2d 82, 84–85 [1]; Cowell v. Employers' Indemnity Corp., 326 Mo. 1103, 34 S.W.2d 705, 709 [4]; Dezell v. Fidelity & Casualty Co., 176 Mo. 253, 75 S.W. 1102 [4]. The recent decisions consider quite comprehensively the prior decisions and demonstrate that prejudice substantially disabling the insurer in its defense is a circumstance to be considered. Statements in Northwestern Mut. Ins. Co. v. Independence Mut. Ins. Co., Mo.App., 319 S.W.2d 898, 902 [3], to the contrary should no longer be followed.

Without the benefit of hindsight (which is always 20/20 vision), it is difficult to see what more McMasters and the Greers could reasonably have done to discover the Zurich coverage sooner than they did. On the other hand, so far as the record shows, Zurich did not have any notice of the accident or receive the suit papers until five months after judgment had been rendered in the personal injury suit. In Florio v. General Accident Fire & Life Assurance Corp., 2 Cir., 396 F.2d 510, previously discussed, the same situation prevailed except the judgment was by default and under New York law the insurance carrier had the right to move to set the default judgment aside within one year after it was served on the company, but it did not do so. Also the question of prejudice was not considered. Notwithstanding the inability of McMasters and the Greers to give notice prior to April 25, 1966, Zurich may have been prejudiced and the trial court found it was; however, the court did find that the personal injury judgment was rendered as the result of a contested trial and that McMasters was represented by competent counsel. On the other hand, the evidence disclosed that the personal injury suit was not filed until almost two years after the accident occurred. In the meantime no investigation had been made as to the manner in which the accident happened although the record is not clear as to the possibility of other witnesses. No interrogatories were propounded to the Greers nor were their depositions taken although they took the defendant's deposition. No physical examinations were made of plaintiffs on behalf of the defendant. No motion for new trial was filed and there was no appeal from the judgment.

■■■ Two witnesses on behalf of Zurich testified at the trial primarily regarding the issue of prejudice. They were Mr. George W. Harlan, claims superintendent for Zurich, and Mr. Glenn A. Burkart, a Springfield lawyer with extensive experience in the defense of personal injury actions. They described in considerable detail the procedures employed in preliminary investigation of such cases, the selection of trial counsel and the possibility of settlement prior to judgment. On this and other evidence which need not be related, the trial court found that Zurich had been

prejudiced by reason of the delayed notice. Considering all the evidence, the trial court's judgment in this regard cannot be said to be clearly erroneous and is affirmed. S.Ct. Rule 73.01(d), V.A.M.R.

Our conclusion that the judgment in favor of Zurich must be affirmed calls for consideration of the contention of F & C and Western that the amount of coverage provided in Zurich's policy is "other insurance" in any event and that the trial court erred in ordering F & C and Western to pay the entire judgment. The condition in question is standard in all three policies and provides that if the insured has other insurance against a loss covered by the policy "the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss."

The liability policy issued by Western has limits of $25,000 for all claims because of bodily injury sustained by each person and $50,000 for all claims arising out of each accident. The liability policy issued by F & C has limits of $25,000 and $50,000 and that of Zurich $100,000 and $300,000. Both F & C and Western insist that the amount limited by Zurich's policy should be considered in the apportionment even though Zurich pays nothing. Western makes the further contention that the proration should be on the total coverages for one accident as opposed to the total coverage for one person. On this basis, Western and F & C would each pay one-sixth of the judgment debt. On the single accident coverage, F & C and Western would each pay one-eighth. On their theories of apportionment, the amount allocated to Zurich as other insurance would remain unpaid. The essential question is whether the Zurich coverage is "valid and collectible insurance" within the purview of this condition.

There are no Missouri cases directly in point on this proposition. Western and F & C rely chiefly on Friedfeld v. Royal Indemnity Co., Fla.App., 167 So.2d 586, to support their contention that the policy term means "valid and collectible" at the time the loss occurs. The plaintiffs cite Gros v. Houston Fire & Casualty Ins. Co., La. App., 195 So.2d 674, which holds that the policy term "valid and collectable" refers not to the time of the accident but to the time of judgment. Certiorari was denied in each case by the Supreme Court of the respective states. We cannot accept either case as wholly accurate and decisive on the facts of the case before us. The insured in the Friedfeld case had taken out two policies of personal liability insurance, one in Royal and another in Eagle Star. Each contained an "other insurance" clause as in this case. The insured gave Royal notice of the Friedfeld claim but neglected to notify Eagle Star within the specified time. The trial court's finding that Royal was obligated to indemnify the insured only for its proportionate share of the loss which was twenty percent was affirmed on appeal. The Florida Court of Appeals held the term "valid and collectible" was meant to apply as of the date of the accident.

In Gros the liability of two companies for payment of a personal injury judgment was involved. The Marquette Company was placed in "rehabilitation" after the accident and before judgment. The Houston Company claimed its policy was excess insurance and not applicable in this situation because Marquette's policy was "other valid and collectable insurance" within the purview of an exclusion specified in its policy. Apparently rehabilitation denotes an inability to pay debts as insolvency does. The Louisiana Court held the term in question referred not to the time of the accident but to the time of judgment. In distinguishing the Friedfeld case it stated: In the Friedfeld case both policies of insurance were at all times legal and valid, but one of the policies was made uncollectable only through the negligence of the insured in failing to furnish timely notice of the accident in accord-

ance with the terms of the policy. In the case at bar the policy was made uncollectable through no fault of the insured, but only through the rehabilitation of Marquette Casualty Company." 195 So.2d 674, at p. 676.

■ It is true, of course, that a valid contract of insurance must be in existence at the time of the accident; unless there is, no liability attaches. Section 379.195, RSMo 1959; State ex rel. McCubbin v. Ginn, Mo., 347 S.W.2d 119, 125 [4]. However, the same considerations do not prevail with respect to the application of the term "collectible". Insolvency of a carrier is generally recognized as a circumstance contemplated by use of the word "collectible". This may occur at any time. An insurance carrier may be solvent on the date of the accident but fail thereafter before a judgment can be obtained and collected. The uncollectibility of an insurance claim should not be required as of any fixed time but the end result should be determinative.

■ Moreover, if the term "collectible" was intended to be limited to insolvency situations, the policy should have so provided. For instance, a valid claim may exist on the date of a casualty but if the claim is based on a tort action which does not survive and the insured dies before a judgment can be obtained the claim is not collectible through no fault of the claimant although the company remains solvent. See Haines v. Harrison, 357 Mo. 956, 211 S.W.2d 489. The courts should not read into a policy a ground of avoidance of liability that is not clearly expressed therein, and doubts and uncertainties in the language used should be resolved in favor of the insured. Aetna Casualty & Surety Co. v. Haas, Mo., 422 S.W.2d 316, 320 [4–7].

■ Our conclusion is that the Zurich policy was not "valid and collectible insurance" as that term is used in the policies because its existence was not known to McMasters or the Greers through no fault of their own and could not reasonably have been discovered by them before it was too late to render it valid and collectible insurance with respect to their claim. In Friedfeld, the insured had procured the Eagle Star policy and was chargeable with knowledge of the existence of the policy, its contents, the provisions for notice and to whom notice should be given. In Bituminous Cas. Corp. v. Travelers Ins. Co., D.C., 122 F. Supp. 197, a similar provision was interpreted to mean other insurance purchased by the insured. In the instant case it was impossible to give the notice upon which liability for the claim depended. Our cases have recognized that a person cannot be at fault when he has no knowledge of the coverage. See McFarland v. United States Mut. Acc. Ass'n, 124 Mo. 204, 27 S.W. 436, 439; Dixon v. United States Fidelity & Guaranty Co., Mo.App., 155 S.W.2d 313, 317 [2], and Northwestern Mut. Ins. Co. v. Independence Mut. Ins. Co., Mo.App., 319 S.W.2d 898, 904.

Furthermore, Western and F & C are not in a favored position to insist on the inclusion of Zurich's policy as valid and collectible insurance. They were in as good or a better position to discover the existence and coverage of the Zurich policy than McMasters or the Greers. All three of the policies provide that notice of the accident can be given "by or on behalf of the insured". Our cases hold the notice does not have to be given by the insured personally. In fact one company sometimes pays the judgment and sues another for contribution. See State Farm Mutual Automobile Ins. Co. v. Central Surety & Ins. Corp., Mo.App., 405 S.W.2d 530. In these circumstances the Zurich policy was not other valid and collectible insurance within the meaning of the policy conditions.

The judgment of the trial court is not clearly erroneous in any particular. In view of the conclusion we have reached, the question relating to the liability of MFA need not be considered.

The judgment is affirmed.

All of the Judges concur.