SMITH, EXRX., APPELLEE, v. ACCELERATION LIFE INSURANCE CO., APPELLANT; FORD MOTOR CREDIT CO., APPELLEE.

(No. 81AP-759—Decided August 3, 1982.)

*Mr. Richard W. Penn,* for appellee Smith.

*Messrs. Knepper, White, Arter & Hadden* and *Mr. James A. Readey,* for appellant Acceleration Life Ins. Co.

*Messrs. Porter, Wright, Morris & Arthur* and *Mr. Robert W. Trafford,* for appellee Ford Motor Credit Co.

NORRIS, J. Acceleration Life Insurance Company appeals from an order of the Court of Common Pleas of Franklin County granting judgment against it, and

in favor of plaintiff, in the amount of $12,450.

In June 1976, Kenneth Smith purchased a 1972 Kenworth truck-tractor from Graham Ford, a Columbus Ford dealer. He signed a retail sales installment contract agreeing to finance the purchase of the truck through Ford Motor Credit Company, agreeing to pay Ford $19,369.80, in thirty monthly installments of $645.66 each, commencing on August 15, 1976. He also purchased credit disability insurance from Acceleration and paid the premium as a part of the total financing package. The policy provided that Acceleration would pay $500 per month to Ford for any balance of the loan period which might remain in the event of Smith's disability.

On January 18, 1977, Smith became totally disabled. Prior to that time, he had failed to make several installment payments. Employees of Ford took possession of the truck on February 14, 1977, and stored it on the lot of the Ford dealer, which ultimately sold the truck in November 1977 for $10,000. While there is some evidence of negotiations between Ford and Smith concerning Smith's reinstating the loan by bringing his payments up to date, apparently he was unable to do so financially. Ford applied the proceeds of sale, less expenses, to the loan balance. Smith sued Acceleration and Ford for $12,450, claiming that was the amount due him under the disability policy and sought to have Ford barred from a deficiency judgment or any right to proceeds from the policy. Ford counterclaimed for $5,174.84, the amount of a claimed deficiency balance on the loan. Smith later died and his executrix was substituted as plaintiff.

At trial, a representative of Acceleration testified that it had paid to Ford, on Smith's behalf, the portion of one month's disability payment that was due from the date of his disability until the date it terminated the disability policy, on February 14, 1977, due to the truck having been repossessed on that date. In terminating the policy, Acceleration relied upon a policy provision that permitted termination in the event "* * * the property upon which the indebtedness is based is legally repossessed * * *." Acceleration also paid $434.35 to Ford, on Smith's behalf, the portion of his premiums which were unearned as of the date of termination.

A representative of Ford testified that the company had taken the truck back because Smith's wife had told him that due to her husband's disability, they could not bring the loan up to current status and continue to make the $145.66 monthly installments that would still be required if the insurance company paid the policy benefits. Mrs. Smith denied these conversations. The truck was sold in November to a retail purchaser, in the same manner as any other vehicle would be sold off the dealer's lot.

In addition to granting plaintiff judgment against Acceleration for $12,450, the trial court dismissed Ford's counterclaim and barred it from any right to the insurance proceeds awarded plaintiff. Ford did not appeal.

Acceleration raises seven assignments of error:

"1.  The trial court erred in holding that the clause in defendant Acceleration Life Insurance Company's insurance policy providing for termination of the policy and a refund of a premium upon legal repossession of the property which is the subject of the loan, was 'unconscionable' under Section 1302.15, Ohio Revised Code.

"2.  The trial court erred in holding that the truck in question was not legally repossessed.

"3.  The trial court erred in holding that the method and legality of the resale of the truck, as well as the commercial reasonableness of the sale, affected the legality of the repossession and the right of Acceleration Life Insurance Company to invoke and enforce the termination clause.

"4. The trial court erred in holding that Acceleration Life Insurance Company was legally responsible for the acts of Ford Motor Credit Company, Graham Ford, and Ford Motor Company, on any theory of agency, piercing of the corporate veil, joint venture, or any other theory.

"5. The trial court erred in refusing to grant Acceleration Life Insurance Company's motion for a 'directed verdict' (motion to dismiss) at the completion of plaintiff's case, and in not finding for defendant Acceleration as a matter of law.

"6. The judgment of the trial court against Acceleration Life Insurance is against the manifest weight of the evidence.

"7. The trial court erred in computing the amount of damages it awarded to the plaintiff to be paid in the event the court was correct in reinstating the policy coverage."

The first, second, third and seventh assignments of error are combined for discussion.

In its written decision, the trial court, in addressing the policy provision that provided for termination upon the property being "legally repossessed," found that the property was not legally repossessed and that its sale was contrary to law, in that R.C. 1317.16 requires that the property be sold at public sale, not private sale. The court further found that the provisions of R.C. 1309.47(C) allowing private sale of collateral were not applicable to the facts of this case, and that the defendants failed to demonstrate that the sale was conducted in a commercially reasonable manner.

R.C. 1317.16 reads, in pertinent part, as follows:

"(A) A secured party whose security interest is taken pursuant to section 1317.071 * * * may, after default, dispose of any or all of the collateral only as authorized by this section.

"(B) Disposition of the collateral shall be by public sale only. Such sale may be as a unit or in parcels and the method, manner, time, place, and terms thereof shall be commercially reasonable. At least ten days prior to sale the secured party shall send notification of the time and place of such sale and of the minimum price for which such collateral will be sold, together with a statement that the debtor may be held liable for any deficiency resulting from such sale, by certified mail, return receipt requested, to the debtor at his last address known to the secured party, and to any persons known by the secured party to have an interest in the collateral. In addition, the secured party shall cause to be published, at least ten days prior to the sale, a notice of such sale listing the items to be sold, in a newspaper of general circulation in the county where the sale is to be held.

"(C) Except as modified by this section, section 1309.47 of the Revised Code governs disposition of collateral by the secured party."

Upon the evidence adduced at trial, the trial court was warranted in finding that the case involved a retail installment contract arising out of a consumer transaction and that the security interest was therefore taken pursuant to R.C. 1317.071; that disposition of the collateral could be accomplished only by public sale; and that, instead, disposition was by private sale, the manner and terms of which were not commercially reasonable.

We turn now to the question of whether or not the trial court was justified in construing the policy term "legally repossessed" to mean the complete statutory process involved when a secured party applies the collateral to the debt owed him — including taking possession of the collateral, selling it, and applying the sale price to the balance owed. When language in a contract of insurance is reasonably susceptible of more than one meaning, it will be construed liberally in favor of the insured and strictly against the insurer. *Buckeye Union Ins. Co.* v.

*Price* (1974), 39 Ohio St. 2d 95 [68 O.O.2d 56]; *Ohio Farmers Ins. Co.* v. *Wright* (1969), 17 Ohio St. 2d 73 [46 O.O.2d 404]; *Newark Gardens* v. *Royal Globe Ins. Co.* (Feb. 11, 1982), Franklin App. No. 81AP-618, unreported.

Acceleration's director of claims and underwriting testified that the purpose of the termination clause was to prevent the secured creditor (the policy's beneficiary) from being paid twice — once from the value of the collateral, and a second time from the policy payments. The chief actuary for the life and health division of the Ohio Department of Insurance testified for Acceleration that the rationale supporting the termination clause is that the policy should be cancelled once "there is no longer an obligation and no insurable interest."[1] Viewed in that context, a secured party's simply taking possession of collateral would not necessarily satisfy the stated purpose of the termination clause; that would have to await an event which extinguishes the insured's insurable interest insofar as the amount of the debt is affected by the value of the collateral.

The only logical conclusion is that the earliest event which could cut off this insurable interest of the buyer is the expiration of his right to possession of the collateral, a right under the Revised Code which is analogous to the doctrine of equity of redemption. Under R.C. 1309.49, a debtor is granted the right to redeem his collateral by fully performing his obligations under the transaction (including payment of the balance due in full) at any time before the secured party disposes of it. That right to redeem the collateral is supplemented, in the instance of a retail installment contract, by the right granted the debtor in R.C. 1317.12 to cure his default and recover the collateral from the secured party by tendering only the past-due installments, deficiency charges, creditor's expenses, and a deposit equal to two installments. This right to cure must be exercised by the debtor within twenty days after the secured party takes possession of the collateral, or within fifteen days after the secured party sends notice to the debtor of his default (that notice is required to be sent within five days after the secured party takes possession).

Accordingly, we conclude that if the termination clause is to be construed to give effect to the rationale and purpose asserted by Acceleration's own evidence, then the policy term "legally repossessed" must mean something more than "repossessed." The term "repossessed" refers simply to a secured creditor exercising his lawful right to take possession of collateral upon default (R.C. 1309.46) in order to preserve his security for payment of the debt. The words "repossession" and "taking" ("taking" is the terminology utilized by the statutes) connote the fact that from the very beginning of a secured transaction a secured creditor has a right to possession of the collateral which, upon default, preempts the debtor's contractual right of possession. The secured creditor is not required to sell the collateral once he has taken possession; he may, for example, elect to return it to the debtor if he again feels secure. "Legally repossessed," on the other hand, as used in the context of the policy, must mean more than the mere act of a secured creditor exercising his lawful right to take possession of collateral upon default in order to preserve his security because such an act, by itself, does not automatically terminate the debtor's insurable interest insofar as the amount of the debt is affected by the value of the col-

---

[1] This rationale is flawed in that it is predicated upon the somewhat erroneous assumption that the debt which is insured will be fully satisfied from the value of the collateral. Often, of course, the amount of the debt exceeds the value of the collateral, resulting in a deficiency when the collateral is sold.

lateral. We therefore conclude that the term "legally repossessed," as used in the subject policy, means the statutory process which is initiated by a secured party's taking possession of collateral when the debtor defaults and which is consummated when the debtor's insurable interest as it relates to the collateral is extinguished, at the earliest, by the expiration of his right to regain possession of the collateral under R.C. 1309.49 and 1317.12. Only at this point in time is the secured creditor-beneficiary in a position to assert full control over the collateral and subject the value of the collateral to the payment of the debt. Under the circumstances of this case then, the truck was "legally repossessed" under the meaning of the policy when it was disposed of by sale in November 1977.

Had Smith become disabled before he defaulted on the retail installment contract, the trial court would have been justified in requiring Acceleration to pay monthly policy benefits through the date the truck was sold, since that was the date it was "legally repossessed" and the date at which Acceleration was warranted in cancelling the policy. However, Smith was in default prior to his becoming disabled. In addition, even if Acceleration were found to be at fault in causing the default, under the circumstances of this case Smith would have been damaged by Acceleration's cancellation of the policy only in the event Ford was granted a deficiency judgment against him, since the policy coverage was predicated on the loan and was designed to protect Smith from the risks associated with a default on the loan (indeed, Ford was the beneficiary of the policy). The trial court refused to grant a deficiency judgment to Ford.

While it may also be argued that Smith would have been damaged by Acceleration or by Ford in the event the value of the truck when it was taken by Ford exceeded the balance due on the loan, especially in view of the sale of the truck not having been conducted pursuant to law, the trial court specifically found that the value of the truck was the same as the balance owing on the retail installment contract.

Accordingly, due to the disposition by the trial court of Smith's claim against Ford, and of Ford's claim against Smith, we are left with a situation where Smith sustained no damage at the hands of Acceleration. The second and third assignments of error are sustained to the extent discussed above.

Although appellant contends that the policy provision providing for termination upon repossession was held unconscionable by the trial court, it appears that the only provision actually held unconscionable by the court was the one whereby the appellant was providing coverage for only $500 of the total $645.66 monthly installment payment, in the event of Smith's disability. To the extent that the trial court held that portion of the insurance contract unconscionable, the first assignment of error is sustained—in view of the testimony of the representative of the Ohio Department of Insurance to the effect that partial coverage was a standard and accepted practice in the industry, there simply was not enough evidence upon which the trial court could make such a finding, as a matter of law. To the extent that the appellant asserts that the trial court held other portions of the insurance contract unconscionable, the first assignment of error is overruled.

In view of our having sustained the second and third assignments of error, any error committed by the trial court in ruling on issues raised by the fourth, fifth, sixth and seventh assignments of error was harmless error, and the assignments of error are therefore overruled.

The first assignment of error is sustained in part and overruled in part; the second and third assignments of error are sustained, and the fourth, fifth, sixth and seventh assignments of error are over-

ruled. The judgment of the trial court is reversed, and this case is remanded to the trial court with instructions to enter judgment for Acceleration.

*Judgment reversed and*
*·case remanded*
*with instructions.*

WHITESIDE, P.J., concurs.

MOYER, J., concurs in judgment only.

MOYER, J., concurring in judgment only. While I concur in the majority's judgment, I disagree with its disposition of the second and third assignments of error.

The majority construes the contract term "legally repossessed" to include the total sequence of events from the time a creditor regains possession of his security until the security is sold to satisfy or partially satisfy the underlying debt owing the creditor. While the majority construes the term to fit the circumstances of this case, their definition of "repossessed" is supported by neither common usage nor by the Uniform Commercial Code. R.C. 1309.46 provides that a secured party "* * * has on default the right to take possession of the collateral." The editor's analysis of the section states:

"This section on self-help repossession came under almost universal attack in the early 1970's as unconstitutional state action in violation of the due process clause. The section gave the debtor no notice and hearing prior to the repossession. * * *"

R.C. 1309.47 describes the duties of the secured party after he has taken possession of the security and paragraph (C) specifically provides for the disposition of the collateral by public or private proceedings. The editor's analysis of R.C. 1309.47 states: "Revised Code 1309.47(C) [UCC 9-504] authorizes the secured party to dispose of repossessed collateral by either public or private sale. * * *" While editor's notes are not authority, they do indicate the common usage of the term "repossession."

In the case of *Greer* v. *Zurich Ins. Co.* (Mo. 1969), 441 S.W. 2d 15, at 27, the Supreme Court of Missouri stated as follows:

"* * * Repossession is commonly understood as the act of resuming the possession of property when the purchaser fails to keep up payments on it. Webster's Third New International Dictionary. As used in the policy, the term does not refer to any technical procedure. * * *"

Paragraph 5 of the official comment under R.C. 1309.47 states:

"Both the Uniform Trust Receipts Act and the Uniform Conditional Sales Act required *a waiting period after repossession and before sale * * *.*" (Emphasis added.)

Paragraph 6 of the official comment under R.C. 1309.47 states the following:

"Section 19 of the Uniform Conditional Sales Act required that sale be made not more than thirty days after possession taken by the conditional vendor. The Uniform Trust Receipts Act contained no comparable provision. Here again this Chapter follows the Trust Receipts Act, and no period is set within which the disposition must be made, except in the case of consumer goods * * *."

Finally, in *Peoples Acceptance Corp.* v. *Van Epps* (1978), 60 Ohio App. 2d 100 [14 O.O.3d 75], the Court of Appeals for the Eighth District discussed the commercial reasonableness of the sale of a repossessed automobile and repeatedly made a clear distinction between the repossession and the sale of the repossessed security. While the Uniform Commercial Code unfortunately does not define "repossession," it is clear that the common usage of the term "repossession" is the act of a secured party taking possession of the security from the debtor.

"Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity

results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." (*Alexander v. Buckeye Pipe Line Co.* [1978], 53 Ohio St. 2d 241 [7 O.O.3d 403], paragraph two of the syllabus.)

In the contract of insurance the word "legally" defines the word "repossessed." In my opinion, it is much more reasonable to construe the term "legally repossessed" to mean that the secured party has taken possession of the collateral pursuant to R.C. 1309.46. Ford Motor Credit took possession of the truck after Smith had defaulted and the taking of the truck was performed without breach of the peace. The truck was therefore legally repossessed. The trial court erred by concluding that the manner of disposition of the truck after the repossession was a legal issue in this case. Clearly it was not.

The majority's construction of the term "legally repossessed" should not be cited as precedent in a subsequent case because it is supported by no case law or other authority but primarily by the principle that an ambiguous term in an insurance contract must be construed strictly against the insurance company. "* * * [S]uch rules of construction and interpretation possess definite limitations. Thus, where the provisions of an insurance policy are clear and unambiguous courts may not indulge themselves in enlarging the contract by implication in order to embrace an object distinct from that contemplated by the parties, * * *." *Gomolka v. State Auto Mut. Ins. Co.* (1982), 70 Ohio St. 2d 166, 168 [24 O.O.3d 274]. There is nothing ambiguous about the term "repossessed," and it is a misconstruction of the word "legally" to conclude that it somehow expands the common definition of "repossessed" to include the disposition of the collateral by the secured party.

The majority concludes that its construction of the term is required by the fact that the insured's insurable interest would not be extinguished until the collateral is disposed of and the sale proceeds applied to the debt. However, there was unrefuted testimony by a representative of Acceleration that, if a debtor, and specifically the plaintiff herein, was to resume payments on his loan, the liability insurance would be reinstated. Said representative testified from his personal knowledge that that was the company's policy and that it had been done on other contracts. That evidence obviates the need for us to specially construe a common term in this case.

The majority's construction of the term "legally repossessed" places the insurance company completely at the mercy of the dealer or the debtor with respect to the disposition of the property. The truck, in this case, sat on the dealer's lot for several months after the dealer took possession. There is no contractual, much less equitable, reason for requiring the insurance company to continue the coverage of the vehicle during that period of time. Acceleration's policy, albeit not contractual duty, of reinstating the insurance coverage if the buyer resumes his payments on the installment contract provides a fair and consistent solution to any inequitable possibility.

While the trial court's decision reflects an understandable empathy to plaintiff, this is a case involving the construction of a contract, not a suit for equitable relief. Plaintiff paid a premium for insurance protection. His disability did not cause him to be in default on the contract with Ford Motor Credit. His payment history can best be described as "late." He paid neither of the monthly installments for the two months preceding his disability. He received nothing less than that to which he was entitled under his insurance contract with Acceleration.