**Kaylin BOLT, Appellant,**

v.

**Gene GIORDANO, Respondent,**

and

**John Shelter, Defendant.**

**No. ED 93121.**

Missouri Court of Appeals,
Eastern District,
Division Four.

April 20, 2010.

238

Kaylin Bolt, Fitchburg, WI, for Appellant.

Thomas A. Spoon, Michelle M. Funkenbusch, St. Louis, MO, for Respondent.

GEORGE W. DRAPER, III, Judge.

Kaylin Bolt (hereinafter, "Bolt") appeals *pro se* from the trial court's judgment in favor of Gene Giordano (hereinafter, "Dealer") on her petition seeking relief from a vehicle sales contract. Bolt raises three points on appeal. We affirm in part, and reverse and remand in part for further proceedings.

On September 22, 2008, Bolt went to First Capitol Auto Sales, owned by Dealer, to shop for an automobile. Bolt test drove a 2001 Chevy Prizm, listed for sale at $3,100.00. When Bolt test drove the vehicle, the "check engine" light came on. Bolt expressed her concern about the light to John Shelton (hereinafter, "Shelton"), the salesman assisting her. The parties came to an agreement that Dealer would repair the vehicle and ensure it passed the safety and emissions inspection because it was not in compliance with state emissions standards, and Bolt would pay an additional $150.00 for a total purchase price of $3,250.00. Dealer told Bolt if the problem reoccurred, she could return the vehicle and it would be repaired again.

Bolt subsequently signed a bill of sale and made a down payment in the amount of $1,250.00. The bill of sale indicated the vehicle was being sold "as is" and there were no warranties or representations made with respect to the vehicle. The bill of sale also contained a handwritten notation, "Safety and Emissions Inspected." Bolt left the vehicle at the dealership to be repaired. Bolt made several phone calls over the course of the next four days to Dealer to check on the status of the repairs. On September 26, 2008, the vehicle failed an emissions inspection. Bolt picked up the vehicle from the repair shop to drive it "through the cycles" to prepare it for retesting. The same day, Bolt tendered the remainder of the purchase price to Dealer.

On September 30, 2008, Bolt called the dealership and informed Shelton she was having the vehicle repaired on October 1, 2008. Prior to taking the vehicle back to the original repair shop, Bolt had the vehicle inspected by another mechanic that uncovered three specific emissions defects. After another series of phone calls, Bolt discovered the vehicle failed emissions testing again on October 7, 2008, and two repairs were made in an effort to solve the problem. Bolt retrieved the vehicle from the repair shop on October 9, 2008, and drove it to prepare it for retesting.

During this time, the "check engine" light came on again. Bolt returned the vehicle to the repair shop on October 20, 2008. After additional repairs, the vehicle passed an emissions inspection on October 23, 2008. Shortly after Bolt picked up the vehicle from the repair shop, the "check engine" light came on a third time, and Bolt contacted Dealer about the issue. Bolt returned the vehicle to the repair shop on November 1, 2008, at which time the "check engine" light was cleared. No further repairs were made and she was told the computer system in the vehicle possibly needed to be reprogrammed or reset.

The "check engine" light illuminated for a fourth time on November 3, 2008. Bolt repeatedly called Shelton and Dealer about the issue, but it was not resolved. Bolt then attempted to return the vehicle to the dealership for a refund of the purchase price, but was told it would be towed at her own expense if she left it at the dealership. After failing a subsequent emissions test, Bolt had the vehicle examined at a different repair shop. At this time, it was discovered the vehicle still suffered from the three specific emissions defects Bolt's mechanic found on September 30, 2008. Bolt received an estimate for the repairs, but was unable to have the repairs completed. Bolt stopped driving the vehicle shortly thereafter.

Bolt sent two certified letters attempting to document and resolve the dispute with Dealer and Shelton; however, the first letter was unclaimed and the second one was refused. Bolt then filed a consumer complaint against Dealer with the Attorney General. Bolt's complaint included an allegation that she had not received title or other paperwork related to the vehicle. In response, Dealer indicated he had "completely filled [his] obligation" to Bolt and "wants no further involvement" with her. The Attorney General declined to take action on Bolt's complaint after Bolt chose to file suit against Dealer.

Bolt filed a *pro se* petition seeking "relief from contract" against Dealer and Shelton on February 13, 2009, bringing three counts for relief. In her first count, Bolt alleged Dealer violated Section 643.315.4(3) RSMo (Cum.Supp.2008)[1] when he sold the vehicle without first receiving a certificate of compliance with state emissions standards, and failed to include specific statutory language in the sales contract notifying her of the right to return the vehicle within ten days of sale.

Bolt alleged the absence of this language rendered the sales contract void. In her second count, Bolt alleged Dealer violated Section 301.210.4 RSMo (2000) when he did not convey title to the vehicle to her at the time of purchase or any time thereafter. Bolt alleged this violation rendered the contract void and constituted a fraudulent practice. In her final count, Bolt averred Dealer violated Section 407.020 in that the allegations raised in her first two counts constituted unlawful practices, requiring the trial court to enter an award for actual damages, attorney's fees, and punitive damages.

Bolt dismissed Shelton from the suit without prejudice on May 14, 2009. Dealer filed an answer denying all of Bolt's allegations and averring all three counts failed to state a claim upon which relief could be granted. On June 2, 2009, the same day Dealer filed his answer, a bench trial was held on Bolt's claims. Bolt proceeded *pro se* while Dealer was represented by counsel. After hearing testimony and receiving exhibits, the trial court entered its judgment in favor of Dealer, denying all of Bolt's claims. Bolt appeals.

Initially, we must address Dealer's request to dismiss Bolt's brief for failure to comply with Rule 84.04. *Pro se* appellants are held to the same standards as those represented by counsel, and their briefs must comply with the rules of appellate procedure. *Patterson v. Dierbergs Mkts., Inc.,* 280 S.W.3d 787, 788 (Mo.App. E.D.2009). Failure to comply with Supreme Court Rules constitutes grounds for dismissal. *Kuenz v. Walker,* 244 S.W.3d 191, 193 (Mo.App. E.D.2007). "It is not for lack of sympathy but rather it is necessitated by the requirement of judicial impartiality, judicial economy and fairness to all parties." *Id.* (*quoting Thornton v. City*

---

1. All statutory references are to RSMo (Cum. Supp.2008) unless otherwise indicated.

*of Kirkwood,* 161 S.W.3d 916, 919 (Mo.App. E.D.2005)).

■ Bolt's *pro se* brief contains several deficiencies which could constitute grounds for dismissal. However, we may exercise discretion to review a deficient brief and the points therein so long as "the deficiency 'does not . . . impede disposition on the merits.'" *State v. Bledsoe,* 178 S.W.3d 648, 653 (Mo.App. W.D.2005)(*quoting State v. Yole,* 136 S.W.3d 175, 178 (Mo.App. W.D. 2004)). The deficiencies complained of by Dealer do not impede the disposition of the appeal; thus, we will address Bolt's points on their merits. *See Hudson v. State,* 270 S.W.3d 464, 467 (Mo.App. S.D.2008).

■ This Court reviews court-tried cases pursuant to the standard set forth in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the judgment unless it is not supported by the evidence, is against the weight of the evidence, erroneously declares the law, or erroneously applies the law. *Id.* We view all of the evidence and the reasonable inferences therefrom in the light most favorable to the judgment and disregard all contrary evidence and inferences. *Cannon v. Monroe,* 285 S.W.3d 375, 381 (Mo.App. E.D. 2009). When neither party requests the entry of findings of fact or conclusions of law, we assume the trial court resolved all issues of fact in accordance with the result reached. Rule 73.01(c); *Jackson v. Cannon,* 147 S.W.3d 168, 170 (Mo.App. S.D. 2004). Therefore, we will affirm the judgment on any reasonable theory within the pleadings that is supported by the evidence. *Pepsi Midamerica v. Harris,* 232 S.W.3d 648, 653 (Mo.App. S.D.2007).

■ In her first point, Bolt argues the trial court erred in denying her claim for damages pursuant to Section 643.315.4(3). Specifically, Bolt claims Dealer violated this section because the sales contract failed to conspicuously disclose that she had a right to return the vehicle within ten days of purchase for repair or a mutually acceptable agreement regarding the repairs when the vehicle was not in compliance with state emission standards. Dealer argues Section 643.315.4(2) applies instead, and the evidence presented shows he was in full compliance with that subsection.

■ There is no Missouri case law discussing this statute. Statutory interpretation is an issue of law; therefore, no deference is due to the trial court's judgment and we review the issue *de novo. City of Richmond Heights v. Waite,* 280 S.W.3d 770, 774 (Mo.App. E.D.2009). "The primary rule of statutory interpretation is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning." *South Metro. Fire Prot. Dist. v. City of Lee's Summit,* 278 S.W.3d 659, 666 (Mo. banc 2009)(*quoting State v. McLaughlin,* 265 S.W.3d 257, 267 (Mo. banc 2008)). "The corollary to this rule is that a court should not interpret a statute so as to render some phrases mere surplusage." *Middleton v. Missouri Dept. of Corr.,* 278 S.W.3d 193, 196 (Mo. banc 2009).

Section 643.315.4(1) gives a licensed motor vehicle dealer the option of selling any vehicle subject to state inspection requirements with or without a prior inspection. If the dealer chooses to sell the vehicle with a prior inspection, subdivision (2) of Section 643.315.4 applies. Section 643.315.4(1)(a). Section 643.315.4(2) states:

> If the dealer chooses to sell the vehicle with prior inspection and approval, the dealer shall disclose, in writing, prior to sale, whether the vehicle obtained approval by meeting the emissions standards established pursuant to [S]ections

643.300 to 643.355 or by obtaining a waiver pursuant to [S]ection 643.335. A vehicle sold pursuant to this subdivision by a licensed motor vehicle dealer shall be inspected and approved within the one hundred twenty days immediately preceding the date of sale, and, for the purpose of registration of such vehicle, such inspection shall be considered timely.

If the dealer chooses to sell the vehicle without a prior inspection, subdivision (3) of Section 643.315.4 applies. Section 643.315.4(1)(b). Section 643.315.4(3) states in pertinent part:

If the dealer chooses to sell the vehicle without prior inspection and approval, the purchaser may return the vehicle within ten days of the date of purchase, provided that the vehicle has no more than one thousand additional miles since the time of sale, if the vehicle fails, upon inspection, to meet the emissions standards specified by the commission and the dealer shall have the vehicle inspected and approved without the option for a waiver of the emissions standard and return the vehicle to the purchaser with a valid emissions certificate and sticker within five working days or the purchaser and dealer may enter into any other mutually acceptable agreement. If the dealer chooses to sell the vehicle without prior inspection and approval, the dealer shall disclose conspicuously on the sales contract and bill of sale that the purchaser has the option to return the vehicle within ten days, provided that the vehicle has no more than one thousand additional miles since the time of sale, to have the dealer repair the vehicle and provide an emissions certificate and sticker within five working days if the vehicle fails, upon inspection, to meet the emissions standards established by the commission, or enter into any mutually acceptable agreement with the deal-

er. A violation of this subdivision shall be an unlawful practice as defined in section 407.020, RSMo. . . .

Bolt argues the controlling factor in determining which of these two subdivisions applies is whether the vehicle received a certificate of compliance with state emission standards within one hundred twenty days prior to the time of sale. Dealer disagrees, arguing the central inquiry should be to determine who agreed to pay for the emission inspection prior to the sale. Dealer argues if the car dealer agrees to pay for the emission inspection then Section 643.315.4(2) applies. Our reading of the statute and the unique facts of this transaction compel us to disagree with both arguments.

It is evident Dealer intended to sell the vehicle without a prior inspection despite his assertion to the contrary. Dealer admitted the vehicle was not in compliance with state emissions standards at the time Bolt test drove the vehicle, before she signed the bill of sale, and after she tendered the full purchase price. Thus, Dealer could not be operating under Section 643.315.4(2) in that the statute required the vehicle "*shall* be inspected and approved within the one hundred twenty days immediately *preceding* the date of sale. . . ." Dealer failed to comply with this statute because there was no valid inspection one hundred twenty days prior to the sale.

We cannot say, however, that Section 643.315.4(3) would apply by default. We agree with Dealer that this subdivision puts the onus on the purchaser to obtain the emissions inspection if the vehicle is sold without a prior inspection. However, before purchasing the vehicle, Bolt actively negotiated with Dealer and Shelton about who would be responsible for the repairs that were needed for the vehicle to pass

inspection. The parties reached an agreement that Dealer would repair the vehicle and ensure it passed the safety and emissions inspection. In exchange for the repairs and inspection, Bolt paid $150.00 in addition to the purchase price, and was told if the problem reoccurred, she could return the vehicle and it would be repaired again. Thus, Dealer accepted the burden of obtaining the emissions inspection and all necessary repairs, which placed the transaction outside of the scheme contemplated by Section 643.315.4(3).

Thus, we find the course of dealings between the parties takes them outside of the purview of both subdivisions. Therefore, we find the trial court did not err in denying Bolt's claim for relief pursuant to Section 643.315.4(3) because that subdivision did not apply to this transaction. Bolt's first point is denied.

■■■■ In her second point, Bolt argues the trial court erred in denying her claim for damages pursuant to Section 301.210.4 RSMo (2000). Bolt asserts Dealer's failure to convey a certificate of title to her at the time she accepted delivery of the vehicle violated this section and rendered the transaction void.

In order to transfer ownership of a vehicle properly, Missouri law requires the seller to assign the certificate of ownership to the purchaser. *Shivers v. Carr*, 219 S.W.3d 301, 303 (Mo.App. S.D.2007). Section 301.210.4 states:

> It shall be unlawful for any person to buy or sell in this state any motor vehicle or trailer registered under the laws of this state, unless, at the time of the delivery thereof, there shall pass between the parties such certificates of ownership with an assignment thereof, as provided in this [S]ection, and the sale of any motor vehicle or trailer registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void.

■■■■ "Missouri is a strict title state, which means assignment of the certificate of title in the manner provided by statute is the exclusive and only method of transferring title to a motor vehicle." *Jackson*, 147 S.W.3d at 172. The statutory requirements of Section 301.210 are absolute, mandatory, and must be enforced rigidly. *Shivers*, 219 S.W.3d at 303–04; *Okello v. Beebe*, 930 S.W.2d 40, 43 (Mo.App. W.D. 1996). Our Supreme Court has explained the importance of strict compliance with Section 301.210 because this section is:

> a special statute, a police regulation "of the highest type" with which "absolute technical compliance" is required, the provisions of which are "rigidly enforced" and as to which there are "no exceptions to conform to intentions." The statute is "drastic, mandatory, and intended as a police regulation in the interest of the public welfare to prevent traffic in stolen automobiles," "to aid in the apprehension of criminals, and to protect the innocent and guileless from the machinations and wiles of the wicked."

*Id.* at 304 (*quoting State v. Glenn*, 423 S.W.2d 770, 774 (Mo.1968)) (internal citations omitted). Bolt bears the burden of proving Dealer failed to deliver the title in order to invalidate the transaction. *Rice v. Farmers & Merchs. Ins. Co.*, 800 S.W.2d 96, 97–98 (Mo.App. S.D.1990).

It is undisputed Bolt never received a certificate of title for the vehicle despite paying the full purchase price and having physical possession of the vehicle.[2] Dealer

---

2. This testimony was in direct contradiction to the language on the sales contract that Bolt signed stating, "I hereby acknowledge receipt and delivery of duly assigned certificate of

makes much of the fact that delivery never occurred because he did not authorize Bolt to pick up the vehicle from the repair shop after it failed several emissions inspections so that the vehicle could be driven for retesting. This argument is disingenuous given there was no evidence presented Dealer took any steps to repossess the vehicle or to prevent Bolt from picking up the vehicle at the repair shop. Nevertheless, we need not resolve this issue because regardless of the time of delivery, it is undisputed Bolt tendered the full purchase price, had physical possession of the vehicle, and demanded title in her complaint to the Attorney General. Dealer responded that he had fulfilled his obligations and wanted no further involvement with Bolt; yet Dealer still retains title to the vehicle.

A party's failure to comply with Section 301.210.4 results in a void and fraudulent sale, where ownership does not pass. *Shivers*, 219 S.W.3d at 304. Moreover, a putative purchaser does not even acquire a right to possess the motor vehicle unless he or she receives a properly-endorsed certificate of title, even if accompanied by full payment or physical delivery of possession. *Citizens Nat'l. Bank v. Maries County Bank*, 244 S.W.3d 266, 273 (Mo.App. S.D.2008). Bolt did not acquire title to the vehicle and had no right of ownership or right to possess the vehicle.

That being said, Bolt is not without a potential remedy. Dealer asserts in his brief that "there is no evidence in the record to refute the existence of an executory contract ..." in response to Bolt's argument that the transaction was

void. "The mere fact that such a transaction is 'executory' does not render it a valid and enforceable agreement of sale." *Greer v. Zurich, Ins.*, 441 S.W.2d 15, 26 (Mo.1969). Generally, a valid contract cannot arise out of transactions which are statutorily prohibited. *Id.* Given the legislature's effort to curtail the trafficking of stolen vehicles, and its intent to outlaw sales without a proper assignment of the certificate of ownership as fraudulent, it would be contrary to public policy to find the sales contract valid and enforceable. *Id.*

Nevertheless, "Missouri cases have recognized the remedy of repudiation and allowed plaintiffs to repudiate purported contracts in cases where Section 301.210 was not followed, despite the fact that the purported contracts were void." *Shivers*, 219 S.W.3d at 304. As such, "[a] contract for the sale of a motor vehicle registered under Missouri law without assignment and delivery of the certificate of title is unlawful and may be repudiated while the transaction remains executory in that the title documents have not been delivered." *Reddish v. Heartland Auto Plaza*, 197 S.W.3d 634, 637 (Mo.App. S.D. 2006); *Greer*, 441 S.W.2d at 25.[3] "[R]epudiation of an executory contract occurs when a party to the contract manifests a positive intention, by word or deed, not to perform." *Minton v. Hill*, 944 S.W.2d 250, 255 (Mo.App. W.D.1997), *overruled on other grounds by Antle v. Reynolds*, 15 S.W.3d 762 (Mo.App. W.D.2000).

A purchaser may repudiate a vehicle sales contract and recover the purchase

---

title to the motor vehicle purchased by me, together with a copy of this bill of sale."

**3.** We are mindful Bolt did not articulate repudiation as a specific part of her claim. However, Bolt introduced evidence of repudiation and attempted tender which was not objected to by Dealer. *See Schroeder v. Zykan*, 255

S.W.2d 105, 112 (Mo.App.St.L.Dist.1953)(finding issue of repudiation was tried by express or implied consent even though not raised in the pleadings when purchaser introduced evidence of repudiation and defendant did not object).

price, provided the purchaser meets two conditions. The purchaser must demonstrate: (1) repudiation of the contract, within a reasonable time, while it remained executory, and (2) return or offer to return the vehicle in substantially as good condition as it was at the time of the sale. *Shivers*, 219 S.W.3d at 304; *Hymer v. Dude Hinton Pontiac, Inc.*, 332 S.W.2d 467, 469 (Mo.App.Spring.Dist.1960); *Lebcowitz v. Simms*, 300 S.W.2d 827, 830 (Mo. App.St.L.Dist.1957). Within this context, a reasonable time has been defined as "within reasonable time after [the purchaser] discovers, *or in the exercise of ordinary care should discover*, the ground for repudiation of the contract." *Kesinger v. Burtrum*, 295 S.W.2d 605, 610 (Mo.App. Spring.Dist.1956).

The record clearly demonstrates both parties have repudiated the contract. Although Dealer has retained the full purchase price, Dealer has not performed by failing to deliver title and refusing Bolt's attempt to return the vehicle. Bolt demonstrated she repudiated the sale within a reasonable time in that less than two months elapsed between the time she negotiated with Dealer to have the emission problems repaired and the occasion she attempted to return the vehicle when she could not register and license it. Moreover, Bolt offered to return the vehicle in as good a condition as it was at the time of the sale. The uncontested evidence shows Bolt drove the vehicle approximately 1,580 miles between the time of purchase and the final emissions inspection in December 2008, and Bolt stopped driving the vehicle after that final inspection. This was sufficient to repudiate the sales contract. *Cf. Smith v. G.F.C. Corp.*, 255 S.W.2d 69, 71 (Mo.App.St.L.Dist.1953)(holding purchaser could not repudiate when "continued enjoyment and hard usage of automobile certainly could not have left it in the condition it was in at the time of the sale" when

salesman used car to travel "all over Ohio" and return to St. Louis every weekend); *Hymer*, 332 S.W.2d at 470 (finding "[c]ommon sense and experience suggest the palpable improbability" the vehicle was in as good a condition as at the time of the sale when it was driven for nine months prior to purported repudiation).

Based on the foregoing, we find Bolt presented a *prima facie* case in support of her allegations that the transaction violated Section 301.210.4, rendering the purported sale void. Further, the essential elements of repudiation have been proven by Bolt. "It is not the label of the cause of action, or the prayer for relief, but instead it is the operative facts stated in the petition which determine the nature of the cause of action." *Minton*, 944 S.W.2d at 256. Thus, the trial court's judgment in Dealer's favor on this count resulted in a misapplication of the law and is erroneous. *Reddish*, 197 S.W.3d at 637. Bolt's second point is granted.

In her final point on appeal, Bolt argues the trial court erred in denying her claim for damages pursuant to the Missouri Merchandising Practices Act (MMPA), Section 407.020.1. In support of her argument, Bolt claims Dealer violated Section 643.315.4(3) and Section 301.210.4, lied about the condition of the vehicle and his intention of making adequate repairs to the vehicle, authorized substandard repairs without her knowledge or consent, failed to return her telephone calls, and refused her certified letters. Bolt claims all of these actions constituted unlawful practices, entitling her to an award of damages. At trial, Dealer argued Section 407.020 did not afford Bolt any relief as a private party, and Bolt did not refute this argument. However, on appeal, Dealer agrees Bolt has a private right of action, but still asserts she has not proven he committed any unlawful practices.

Section 407.020.1 declares an unlawful practice shall include, "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce. . . ." The act is intended to protect consumers and to "supplement the definitions of common law fraud in an attempt to preserve fundamental honesty, fair play and right dealings in public transactions." *Huch v. Charter Communications, Inc.*, 290 S.W.3d 721, 724 (Mo. banc 2009)(*quoting State ex rel. Danforth v. Independence Dodge, Inc.*, 494 S.W.2d 362, 368 (Mo.App.K.C.Dist.1973)).

Section 407.025.1 grants an individual "who purchases or leases merchandise . . . and thereby suffers an ascertainable loss of money or property" the right to pursue a private cause of action based on a violation of the MMPA. *Ullrich v. CADCO, Inc.*, 244 S.W.3d 772, 777 (Mo.App. E.D. 2008). Despite our ruling that Dealer's purported sale of the vehicle was rendered void and fraudulent due to the violation of Section 301.210.4, Bolt may still assert this claim. *See Antle*, 15 S.W.3d at 768 (holding Section 301.210.4 did not bar purchaser from maintaining a claim under the MMPA, even though there was no contemporaneous assignment of certificate of title).

█ Thus, we turn to Bolt's assertion that she presented sufficient evidence to support her claim. Our disposition of Bolt's first point on appeal likewise disposes of Bolt's claim that Dealer's alleged violation of Section 643.315.4(3) constituted an unfair practice. Given that we found the statute inapplicable, Dealer's conduct could not constitute an unfair practice. Moreover, Bolt's claim with respect to Dealer's failure to transfer title also fails.

While the court in *Antle* permitted a purported purchaser who had not received title to maintain a claim under the MMPA despite no purchase being consummated, the court limited its holding, cautioning:

> We are not here deciding that *any* claim of false representation against a dealer may be maintained in a transaction in which title was not delivered. Rather, we hold only that common law fraud claims may be pursued when the primary fraud claim relates to a misrepresentation concerning the status or the delivery of title, and other claims of fraud related to the transaction are attendant thereto. It seems that in order to avoid undermining the public policy of Section 301.210.4, a buyer who deliberately buys a motor vehicle without a contemporaneous assignment of title should not be entitled to complain of fraud in other aspects of the transaction if the buyer knew that no contemporaneous assignment of title would take place.

*Antle*, 15 S.W.3d at 768 n. 2. Bolt does not allege Dealer made any false representations with respect to the delivery of title, just that he failed to do so. As such, her claim for damages pursuant to the MMPA regarding a violation of Section 301.210.4 fails. Finally, we find no evidence to support Bolt's claim Dealer committed other unlawful practices with respect to their transaction. We examine Dealer's conduct, not his intent, to determine whether a violation has occurred. *Huch*, 290 S.W.3d at 724. Bolt was aware of the vehicle's mechanical problems prior to paying for the vehicle and was aware it failed the emissions inspections several times and was repeatedly repaired unsuccessfully. As such, there was no deception regarding any material fact of the transaction. While we do not condone Dealer's lack of communication with Bolt during the course of their dealings, this does not rise to the

level of an unlawful practice entitling Bolt to damages under the MMPA. Bolt's third point is denied.

The trial court's judgment is affirmed in part, and reversed and remanded in part for further proceedings consistent with this opinion.[4]

KURT S. ODENWALD, P.J., and GARY M. GAERTNER, JR., J., concur.

4. Rather than remand for a new trial, in the interest of judicial economy, we advise the trial court to enter judgment in favor of Bolt for $3,250.00, the purchase price of the vehicle, at the time upon which she returns said vehicle to Dealer.